(No. 83911

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ROBERT CASILLAS, Appellant.

*Opinion filed November 16, 2000.—Rehearing denied June 4, 2001.*

464

FREEMAN, J., joined by McMORROW and RATHJE, JJ., specially concurring.

HARRISON, C.J., concurring in part and dissenting in part.

Rita A. Fry, Public Defender, of Chicago (Alison Edwards, Assistant Public Defender, of counsel), for appellant.

James E. Ryan, Attorney General, of Springfield, and Richard A. Devine, State's Attorney, of Chicago (William L. Browers, Assistant Attorney General, of Chicago, and Renee Goldfarb and Sari London, Assistant State's Attorneys, of counsel), for the People.

JUSTICE HEIPLE delivered the opinion of the court:
Following a jury trial in the circuit court of Cook

County, defendant, Robert Casillas, was convicted of two counts of first degree murder. Defendant waived his right to a jury for purposes of sentencing, and the trial court found him eligible for the death penalty on the basis of having committed two or more murders. After hearing evidence in aggravation and mitigation, the trial court sentenced defendant to death. Defendant's sentence has been stayed pending direct review by this court. Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d R. 609(a). For the reasons that follow, we affirm.[1]

## BACKGROUND

The following evidence was adduced at trial. At approximately 5:15 p.m. on February 24, 1989, police responded to a holdup alarm at Key Jewelers, 6903 North Clark Street, in Chicago. Upon their arrival, police found the back screen door of the store ripped and the back door open. Snow on the ground near the back door was trampled on and police found several pieces of gold jewelry on the ground near the rear of the store and in the alley behind the building.

Inside the store, police discovered the bodies of the owners, Myung Choi and her husband, Chang Choi, each dead from a gunshot wound to the head. Jewelry was on the floor and several cases had been opened and emptied out. Police investigators recovered several spent shell casings and a right-hand black leather glove from the scene. Additionally, one live round was found laying on top of Mrs. Choi's leg and another bullet was recovered from a ceiling panel. A firearms examiner determined that all of the bullets, including those recovered from the bodies of Mr. and Mrs. Choi, were fired from the same

---

[1]A codefendant, Guadelupe Aguilar, was also tried and convicted of two counts of first degree murder for the instant crimes.

.32 caliber semiautomatic weapon. Police also recovered 28 fingerprint impressions from the scene, but no murder weapon was found and the crimes remained unsolved for several years.

In May 1995, acting on a tip from a confidential informant, police contacted Patty Farias, at whose apartment defendant stayed during early 1989. The apartment was located on West Farwell, around the corner from Key Jewelers. According to Farias, as she arrived home from work and parked her car the evening of February 24, 1989, she noticed several police cars and officers going in and out of the jewelry store. When she got to her apartment, Farias found the door deadbolted from the inside, which was unusual. She knocked on the door and codefendant Guadelupe Aguilar, whom Farias knew by the nickname "Stilleto," let her inside. Farias went to her bedroom, which was also locked. Defendant, whom Farias also knew by his nickname "Rush," opened the door, and Farias saw two large green trash bags, several black jewelry trays and pieces of gold jewelry strewn across the bed.

Farias became angry and demanded defendant leave her apartment. Defendant gathered up the trash bags and jewelry and, at defendant's request, Farias drove defendant and Aguilar to the home of defendant's sister, Alvina Hernandez. Once there, the two men removed the bags from the trunk of Farias' car and took them into the house. Farias did not see either man again, and spoke to defendant on only one other occasion approximately one month later, when defendant called Farias to ask how her children were. Farias stated that she never went to the police because she was afraid.

Police then interviewed defendant at Area 3 headquarters. After being advised of his *Miranda* rights, defendant spoke privately with Chicago Police Detective Richard Zuley, eventually admitting to his involvement

in the crimes committed at Key Jewelers on February 24, 1989. Assistant State's Attorney Joseph Alesia subsequently arrived to speak with defendant, and, after again being advised of his *Miranda* rights, defendant agreed to give a handwritten statement. In his statement, defendant said that both he and Aguilar stayed at Farias' apartment the night of February 23, 1989. Farias left for work the next morning and her two children went to school, leaving defendant and Aguilar alone in the apartment all day. Defendant stated that, at approximately 4 o'clock on the afternoon of February 24, he and Aguilar walked around the corner to Key Jewelers to "case it," meaning to look for security and see if the store would be easy to rob. After looking around the store and looking at some of the jewelry, the two men left.

Defendant and Aguilar walked back to Farias' apartment, where they were still the only ones home. The two men snorted some cocaine, and then went back to Key Jewelers at approximately 5:10 p.m., in defendant's words, "to rob it." Mr. and Mrs. Choi were the only persons present in the store. After entering the store, defendant stated, Aguilar told him to keep his eyes open, meaning that "something was going to happen." While Aguilar looked at a gold medallion, defendant stated that he stood by the display cases near the front of the store to watch for anyone approaching.

According to defendant's statement, he then heard a pop, at which time he turned around and saw Aguilar's arm extended and either a .25- or .32-caliber gun in his hand pointed at Mr. Choi's head. Mr. Choi slumped down, at which time Mrs. Choi ran to the back of the store and pressed an alarm buzzer. Aguilar chased the woman to the back of the store, grabbing her by the neck. Aguilar tried to shoot Mrs. Choi, but the gun jammed, and a live bullet popped out of the gun. Aguilar then shot Mrs. Choi once in the head and she fell to the ground.

Defendant stated that Aguilar then began emptying trays of jewelry into a box, handing defendant approximately seven or eight jewelry trays. The two men removed a board from the back door and escaped through the back, cutting through an alley and a gangway to Farias' apartment. Shortly after they arrived back at the apartment, Farias came home and found defendant on her bed with the trays of jewelry. According to defendant, Farias "started looking for answers from him," at which time he and Aguilar put the jewelry in plastic garbage bags. Defendant then pulled Farias' car up to the apartment. Aguilar came out of the apartment carrying the trash bags of jewelry. Farias also came out and drove the two men to defendant's sister's home, where defendant and Aguilar stayed overnight. Defendant further stated that the next day, Aguilar gave him a handful of gold chains, rings and medallions which he gave away the following week.

The cause proceeded to trial in April 1997. Defendant and Guadelupe Aguilar were tried in simultaneous, severed trials before two separate juries. The State's theory at trial was that defendant and Aguilar planned and carried out the robbery together, but that it was defendant who actually shot and killed Mr. and Mrs. Choi. In addition to testimony by several other police personnel who responded to the initial alarm and who worked on the case, latent fingerprint examiner Officer William Kovacs testified for the State as to two fingerprint impressions and one palmprint impression taken from a counter at the store which matched those of Aguilar. Detective Zuley testified as to his conversation with defendant prior to defendant's giving his handwritten statement in which defendant stated that he was wearing a pair of dark-colored gloves, either dark green or black, the day of the murders.

Patty Farias also testified on behalf of the State,

repeating her account of the events of February 24, 1989, as previously told to police in 1995. Additionally, Farias stated that defendant had told her a month prior to the murders that he wanted to get a gun because he always had one. Farias added, however, that she had never seen defendant carrying a gun, nor did she ever see a gun in her apartment.

Paul Hernandez, defendant's brother-in-law, also testified for the State. He and his wife, Alvina, defendant's sister, were home with several other family members the evening of February 24, 1989, when defendant and Aguilar arrived. Hernandez testified that Aguilar was carrying about three bags of jewelry, which he placed on the kitchen table. Aguilar told Hernandez that they had robbed a jewelry store, and then gave Hernandez's brother a gold bracelet and offered to sell some of the jewelry to Hernandez. Hernandez further stated that he thought Aguilar had a gun because he had his shirt untucked on one side and was constantly adjusting his pants, although he did not actually see either Aguilar or defendant with a gun. The next morning, Hernandez asked both men to leave his house.

Additionally, the jury heard testimony regarding defendant's August 1995 escape from the Cook County jail, where he was being held pending trial. Victor Cervantes, whom defendant did not know, but who was attending a party near the Cook County jail the night defendant escaped, testified that he invited defendant inside and later arranged a ride for defendant. William Prybell of the fugitive warrant unit of the Cook County sheriff's police apprehended defendant approximately one month later in Pasadena, Texas, and transported him back to the custody of the Cook County department of corrections. The trial court instructed the jury to consider defendant's escape only as evidence of his consciousness of guilt.

Defendant testified on his own behalf, providing a different account from that in his earlier statement to police. Defendant stated that he and Aguilar stopped by the jewelry store initially, not to case it, but to look at jewelry on their way to find Patty Farias' car, which they believed was parked nearby on the street. Defendant further stated that, after they went back to Farias' apartment, Aguilar told him he wanted to purchase a ring he had seen earlier in the store. They went back to Key Jewelers and Aguilar spoke with Mr. Choi while defendant looked at jewelry. According to defendant, he was scared and shocked when he heard the first shot. He saw Aguilar chase Mrs. Choi to the back of the store and shoot her, at which time, defendant stated, he fell to his knees and felt sick and scared. Defendant further testified that he only helped Aguilar carry jewelry out of the store out of fear, and initially refused to accept any of the proceeds of the robbery, but kept some of the jewelry after Aguilar gave him a "crazy look." Defendant said he only signed the handwritten statement admitting to participation in the robbery after Assistant State's Attorney Alesia promised him he would not be charged with murder. He also stated that he escaped from the Cook County jail because he feared for his safety when the business card Alesia gave to him was taken away, although defendant did not know who took the card.

At the close of all the evidence, the jury was instructed on intentional, knowing and felony murder as well as on the law of accountability. The trial court, however, failed to give Illinois Pattern Jury Instructions, Criminal, No. 2.02, instructing the jury that an indictment is not evidence of guilt, and Illinois Pattern Jury Instructions, Criminal, No. 2.03, instructing the jury as to the presumption of innocence and the burden of proof. The jury returned a general verdict finding defendant guilty of both murders.

Defendant waived his right to a jury for his death penalty sentencing hearing, and, after admitting the jury verdicts into evidence, the court found him eligible for the death penalty on the basis of having committed two or more murders. 720 ILCS 6/9—1(b)(3) (West 1996).

At the aggravation-mitigation phase of defendant's death penalty hearing, the prosecution introduced evidence of defendant's extensive criminal history, which included evidence linking defendant to the September 1991 shooting of Artemio Garcia and the October 1991 murder of Gerardo Gonzalez. The prosecution also introduced evidence of defendant's numerous disciplinary infractions while in the custody of the Department of Corrections, as well as his 1995 escape and previous escape attempts in 1983 and 1984.

In mitigation, defendant presented testimonial evidence of his good behavior while in custody at Stateville Prison. Defendant's brother and sister offered evidence of defendant's abusive childhood. Defendant's childhood foster father also testified on his behalf.

At the close of all the evidence, the trial court ruled that there was no mitigation sufficient to preclude the imposition of the death penalty, whereupon defendant was sentenced to death. Defendant's subsequent motion for a new trial, sentencing hearing, and reconsideration of sentence was denied.

## ANALYSIS

Defendant raises 11 issues on appeal, challenging both his conviction and death sentence. We address each in turn.

### Trial Errors

#### Jury Instructions

Defendant first contends that his right to due process and a fair trial was violated when the trial court failed to give Illinois Pattern Jury Instructions, Criminal, No.

2.02 and No. 2.03 (3d ed. 1992) (hereinafter IPI Criminal 3d). IPI Criminal 3d No. 2.02 states:

> "The [(information)(indictment)(complaint)] in this case is the formal method of accusing the defendant[s] of an offense and placing [(him)(them)] on trial. It is not any evidence against the defendant[s] and does not create any inference of guilt."

IPI Criminal 3d No. 2.03 states:

> "[(The) (Each)] defendant is presumed to be innocent of the charge[s] against him. This presumption remains with him throughout every stage of the trial and during your deliberations on the verdict and is not overcome unless from all the evidence in this case you are convinced beyond a reasonable doubt that the defendant is guilty.
>
> The State has the burden of proving the guilt of the defendant beyond a reasonable doubt, and this burden remains on the State throughout the case. The defendant is not required to prove his innocence."

At trial, neither the State nor defense tendered either instruction to the court. Defendant did not object to the omission of these instructions at trial or in his post-trial motion. Ordinarily, the failure of a defendant to tender an instruction or to otherwise object at trial waives the issue for appellate review. *People v. Layhew*, 139 Ill. 2d 476, 485 (1990). Defendant, however, argues that trial counsel's failure to do so constitutes ineffective assistance of counsel. Additionally, defendant claims that, in keeping with the constitutional requirement that he be provided a fair trial, principles of waiver or procedural default do not apply.

In *Layhew*, we noted that a written instruction informing the jury of the presumption of defendant's innocence and the State's burden of proving defendant guilty beyond a reasonable doubt is a time-honored and effective method of protecting a defendant's right to a fair trial, which is guaranteed by the due process clause of the fourteenth amendment. *Layhew*, 139 Ill. 2d at 486, citing *Taylor v. Kentucky*, 436 U.S. 478, 490, 56 L. Ed. 2d

468, 478, 98 S. Ct. 1930, 1937 (1978). Thus, despite defendant's failure to object, this court will notice this error and endeavor to determine whether defendant was denied a fair trial by the court's failure to *sua sponte* give IPI Criminal 3d No. 2.03.

The court bears the burden of seeing that the jury is instructed as to the presumption of innocence and the burden of proof. Although error, the trial court's failure to give this written instruction does not automatically result in a finding that defendant's constitutionally protected right to a fair trial has been violated. *Kentucky v. Whorton*, 441 U.S. 786, 789, 60 L. Ed. 2d 640, 643, 99 S. Ct. 2088, 2090 (1979). In *Layhew*, this court adopted the totality of the circumstances analysis used by the United States Supreme Court in *Whorton*. Under this test, to determine whether defendant received a fair trial, we must look to all the circumstances including all the instructions to the jury, the arguments of counsel, whether the weight of the evidence was overwhelming and any other relevant factors. *Layhew*, 139 Ill. 2d at 486, quoting *Whorton*, 441 U.S. at 789, 60 L. Ed. 2d at 643, 99 S. Ct. at 2090.

Applying this test to the facts of the instant case, we find the jury was adequately informed about the burden of proof and the presumption of innocence. Under the first factor enunciated in *Whorton*, the reviewing court looks to the instructions that the trial court actually did give the jury. Here, at the start of *voir dire*, the trial court discussed at length, repeatedly and in the presence of all the jurors, the State's burden of proof and defendant's presumption of innocence. Specifically, the trial judge stated to all potential jurors:

"One of the significant characteristics in a criminal case is that the State bears the burden of proof in a criminal case. The standard is proof beyond a reasonable doubt. In a criminal case the State bears the burden to prove the defendant guilty beyond a reasonable doubt. That burden never shifts. It remains with the State throughout the trial.

Kind of on the other side of that coin is a constitutional principle that has to do with our system of law, and that is called the presumption of innocence. Under our system of law, every criminal defendant, meaning one who has been accused of committing a crime, every criminal defendant, not just this defendant, but any criminal defendant is in the law presumed innocent. Sometimes that is described as saying a defendant is cloaked with the presumption of innocence.

That presumption of innocence remains with the defendant throughout the trial and never goes away. That presumption of innocence remains with the defendant even while the jury is deliberating. That presumption of innocence is not removed or rebutted until and unless the jury, having been instructed and having heard all the evidence and deliberating, removes that presumption with a finding of guilty. Those are two very basic premises under our system of law, and one has to keep in mind throughout jury service on a criminal case.

The defendant in a criminal case under our system of law, and it doesn't matter whether it is a state court or federal court, any jurisdiction, a defendant in a criminal case has no burden. All of the burden in the criminal case is on the prosecution. There is no burden on the defendant, and by that I mean the defendant does not have to present any evidence. A defendant may choose to present evidence. What is important to understand is that there is no requirement for a defendant to present evidence.

A defendant does not have to prove anything. The burden of proof is on the prosecution. Least of all, the defendant does not have to prove his innocence. It is the State's obligation under our system of law to prove the defendant guilty beyond a reasonable doubt. That is the only burden and it stays with the State throughout the trial."

The trial judge then went on to state that the defendant is under no obligation to testify on his own behalf, explaining:

"Well, number one, remember that I said to you that it is the State's burden to prove the defendant guilty beyond a reasonable doubt with their presumption of evidence. That has nothing to do with whether the defendant testifies or

does not testify. That is the first reason. The defendant has no burden \*\*\*."

The first group of 14 potential jurors was then called to the front of the courtroom for questioning, at which time the trial judge again repeated:

"Do you understand in the trial of a criminal case that it is the State who has the burden of proving the defendant guilty beyond a reasonable doubt, and that burden remains with the State throughout the trial and never goes away.

Does everybody understand that, and does everybody understand that the defendant in a criminal trial under our system of law has no burden. He doesn't have to present evidence, he doesn't have to testify. He may present evidence, may testify, but that is a criminal defendant's decision. There is no burden on the defendant to do anything. And least of all, prove his innocence.

Does everybody understand that the defendant in a criminal trial has no burden."

As *voir dire* continued, the trial judge again reminded the remaining venire of the presumption of innocence and the State's burden of proof, stating:

"Because it has been a while, let me briefly go over a few principles with you. Remember, the burden stays with the State, and that burden is to prove the defendant guilty beyond a reasonable doubt.

Does everybody understand that? Anybody that doesn't understand that?

You further understand that the defendant in a criminal case, any criminal case in any court in this country, has no burden. There is only one burden, and it is on the State. Does everybody understand the defendant has no burden. He doesn't have to present evidence, does not have to prove anything. He does not have to present evidence. That is his option.

What is important to understand is that the defendant in a criminal case under our system of law does not have to do anything. Does everybody understand?

You further understand that under our system of law by application of the law, every defendant in every case is

cloaked with the presumption of innocence, and that presumption remains with the defendant throughout the trial, and never goes away, and is still with the defendant even during deliberations by the jury on the verdict, and that presumption is not removed or rebutted until and unless the jury does so by returning a verdict of guilty.

Does everybody understand that the defendant is presumed in law to be innocent?"

At no time did any member of the venire express any difficulty in understanding these concepts. Furthermore, after the jury was empaneled, prior to the start of trial, the trial court again explained to the jury that the State bears the burden of proof, stating:

"Once the State has concluded its evidence, its case in chief, the defense, if it wants to, will put on their evidence. *** Remember what I told you last week and that is the defendant is not required to do anything, not required to put on evidence. He may if he wishes to. ***

Once defense has concluded its evidence, the State has another opportunity to present evidence. It's called rebuttal evidence. That is simply an opportunity again based on the fact that the State bears the burden to prove the defendant guilty beyond a reasonable doubt ***."

In addition, the trial court again informed jurors just prior to closing arguments that the State would have an opportunity to speak in rebuttal because it bore the burden of proof beyond a reasonable doubt. Finally, the written instructions provided and read to the jury just prior to deliberations on the elements of each offense additionally stated:

"If you find from your consideration of all the evidence that each one of these propositions has been proven beyond a reasonable doubt, you should find the defendant guilty. If you find from your consideration of all the evidence that any one of these propositions has not been proven beyond a reasonable doubt, you should find the defendant not guilty."

Thus, even though the trial court did not specifically instruct the jury in accordance with IPI Criminal 3d No.

2.03, all jurors were throughly instructed by the court, both at the beginning and conclusion of trial, as to the presumption of innocence and the State's burden of proof beyond a reasonable doubt.

This court in *Layhew*, following the Supreme Court in *Whorton*, also identified the statements of counsel as significant. In the instant case, defense counsel discussed the State's burden of proof during his closing argument, repeating three times that the jury must find defendant guilty beyond a reasonable doubt. The State also reminded the jury that defendant is presumed innocent in its rebuttal closing argument.

Another factor identified in *Whorton* as important under the totality of the circumstances analysis is whether the evidence against defendant is overwhelming. In *Layhew*, this court held that the omission of IPI Criminal 2d No. 2.03 did not deprive defendant of a fair trial, despite finding the evidence of defendant's guilt short of overwhelming. *Layhew*, 139 Ill. 2d at 490-91. By contrast, in the instant case, the evidence of defendant's participation in the Key Jewelers robbery and murders is overwhelming. Defendant admitted to police to having gone to Key Jewelers at first to "case" the store, and then later to act as a lookout during the robbery. Despite defendant's testimony at trial that he was shocked and scared when Aguilar shot and killed Mr. and Mrs. Choi, at no time did defendant deny helping Aguilar remove the jewelry from the store afterward. Furthermore, two witnesses, Patty Farias and Paul Hernandez, testified to seeing defendant in possession of several bags of jewelry and jewelry trays. Regardless of whether the jury believed it was Aguilar who pulled the trigger and killed Mr. and Mrs. Choi, the evidence presented at trial, at a minimum, overwhelmingly supports defendant's accountability because of his assistance in planning and carrying out the crimes.

Defendant points out that several jurors were selected from a panel which was not separately asked after being called to the front of the courtroom for questioning whether they understood the presumption of innocence and the State's burden of proof. Defendant also argues that the court's reminder to jurors that it would be instructed on the law to apply during deliberations eradicates any ameliorative effect the court's earlier statements regarding the presumption of innocence and burden of proof may have had. Additionally, defendant argues that the evidence against defendant was not overwhelming, and that a properly instructed jury might have believed defendant's testimony, resulting in an acquittal.

After a thorough review of the record, however, we conclude that the jury was adequately informed about the burden of proof and the presumption of innocence. Although the court in *Layhew* relied upon the fact that each juror was questioned about his understanding of the principle that a defendant is presumed innocent until proven guilty beyond a reasonable doubt, such individual inquiry is not a necessity to reach such a conclusion. In the instant case, the trial court very clearly impressed upon the jury the importance of its duties, and asked venire members as a group whether they had any difficulty in understanding the presumption of innocence and burden of proof. Not one person indicated he or she did not understand. Furthermore, these concepts were repeated during closing arguments and again in the instructions on the elements of the offenses charged. Lastly, unlike in *Layhew*, the evidence of defendant's guilt in the instant case is overwhelming. Under the totality of the circumstances, we believe the result of this trial would not have been different had the trial court provided IPI Criminal 3d No. 2.03 in written form and therefore, that the court's failure to do so is harmless beyond a reasonable doubt.

We also reject defendant's claim that he was denied a fair trial by the court's failure to *sua sponte* give IPI Criminal 3d No. 2.02, instructing the jury that defendant's indictment is not to be considered as evidence of guilt. Despite defendant's attempt to argue otherwise, IPI Criminal 3d No. 2.02 does not invoke constitutional rights as does IPI Criminal 3d No. 2.03. Therefore, its omission is not examined under a plain error analysis. Thus, any argument regarding the court's failure to give IPI Criminal 3d No. 2.02 is waived due to defendant's failure to tender the instruction to the trial court and his failure to object to its omission at trial and in his post-trial motion.

We further reject defendant's claim that trial counsel was ineffective for failing to object to the omitted instructions. To demonstrate ineffective assistance of counsel, a defendant must show (1) that his attorney's performance fell below an objective standard of reasonableness and (2) that the attorney's deficient performance resulted in prejudice to the defendant. *People v. Williams*, 181 Ill. 2d 297, 320 (1998), citing *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984). First, as explained above, the outcome of defendant's trial would not have been any different had IPI Criminal 3d No. 2.03 been given. Thus, defendant suffered no prejudice from its omission and his claim of ineffective assistance of counsel fails. Similarly, we do not believe defendant was prejudiced by the trial court's failure to give IPI Criminal 3d No. 2.02. The trial judge read the indictment to the entire venire prior to *voir dire*, explaining:

"Ladies and gentlemen, those are the charges in this case. Those are the offenses with which the defendant on trial is accused. I want to make clear to you now that what I just read to you is not evidence. Those are the formal charges that are necessary to bring the defendant to trial. It is important to understand that is the charging docu-

ment, called an indictment. That is not evidence. That formally states the charges."

In light of the trial court's instructions to the jury and the overwhelming evidence of defendant's guilt, we do not believe the outcome of the trial would have been any different had IPI Criminal 3d No. 2.02 been read to the jury. Thus, we hold defendant was not prejudiced by counsel's failure to tender the instruction or to object and trial counsel was therefore not ineffective.

### Irrelevant Gang Evidence

Defendant next claims that he was denied a fair trial when the State elicited testimony from him regarding his affiliation with the Latin Kings, and when it made reference to defendant's nickname in its closing argument.

Prior to trial, the court reserved a ruling on defendant's motion *in limine* to exclude any evidence relating to defendant's gang membership and gang involvement. At trial, the State called Victor Cervantes to testify regarding defendant's August 1995 escape from the Cook County jail, which evidence was admissible for the limited purpose of showing defendant's consciousness of guilt. On direct examination, Cervantes stated that he was attending a party near the jail when he saw defendant standing on a corner. Cervantes did not know defendant, but approached him on the corner where they spoke briefly. Cervantes then invited defendant to the party. Later, defendant asked Cervantes for a ride, and Cervantes arranged for his brother to drop defendant off at a house approximately 1½ miles away.

On cross-examination, defense counsel raised the unlikelihood that Cervantes would be so helpful to a total stranger. After a sidebar, the court allowed Cervantes to testify as to the fact that he and defendant were both members of the Latin Kings for the purpose of explaining why he would invite defendant inside and offer him help. Cervantes stated that, during his initial conversa-

tion with defendant, defendant showed Cervantes a tatoo, proving his membership in the Latin Kings. Cervantes added that his brother agreed to give defendant a ride because of their mutual membership in the gang.

Defendant does not complain of Cervantes' testimony, but claims that during the State's cross-examination of defendant, it overstepped the limited purpose for which the trial court had allowed evidence of his gang affiliation, that limited purpose being to rebut the insinuation that Cervantes was not testifying truthfully. Specifically, defendant claims error with regard to the following, raised by the State during its cross-examination of defendant: (1) that defendant's nickname "Rush" is an acronym for Royalty Under Supreme Heritage, a Latin Kings name; (2) that defendant has a Latin Kings tatoo; (3) that fellow Latin Kings members gave defendant a gun and $1,000 to help him flee to Texas after his escape from jail; and (4) that Latin Kings in Texas helped defendant hide. Additionally, defendant complains of several references to his nickname "Rush" during the State's closing and rebuttal closing arguments.

Defendant concedes that he "opened the door" to the introduction of gang evidence through his cross-examination of Cervantes, but argues that once the State cleared up any false impression induced by Cervantes' testimony, any further evidence about gangs was irrelevant and prejudicial. The State responds that, based on the insinuations which arose during defendant's cross-examination of Cervantes, the State was properly allowed to introduce evidence of defendant's gang membership in order to explain how and why defendant received help when he escaped and to demonstrate defendant's consciousness of guilt. We agree with the State.

Evidence of gang affiliation is admissible as long as the relevance of the evidence is established. *People v. Towns*, 174 Ill. 2d 453, 477 (1996). In the instant case,

once defense counsel suggested that Victor Cervantes' testimony was not credible by remarking on the unlikelihood that he would assist a total stranger, the trial court found gang evidence rebutting this suggestion admissible. Evidentiary rulings of this nature will not be overturned on appeal unless a clear abuse of discretion is shown. *People v. Gonzalez*, 142 Ill. 2d 481, 489-90 (1991). Here, we do not believe the trial court abused its discretion. Further evidence that other total strangers, some as far away as Texas, provided defendant assistance solely because of his affiliation in the same gang serves to reinforce Cervantes' testimony that he did the same, rebutting the implication, raised during defendant's own cross-examination of Cervantes, that he was testifying untruthfully.

Furthermore, we note that defendant has waived any claim of error relating to the State's use of his nickname "Rush" during closing arguments by failing to raise it in his post-trial motion. See *People v. Williams*, 181 Ill. 2d 297, 322 (1998). Defendant also waived any claim of error regarding his Latin Kings tatoo by not objecting to the State's questioning of him on this issue during cross-examination. Additionally, any statements by defendant regarding his tatoo were cumulative of the properly admitted testimony of Victor Cervantes that he identified defendant's gang membership by his tatoo. Similarly, defendant's statement during cross-examination that his nickname is Rush, a Latin Kings acronym for Royalty Under Supreme Heritage, was cumulative of earlier testimony by Patty Farias and Paul Hernandez that they both call defendant Rush. While the jury was not aware at this point what Rush stood for, they were already aware of defendant's membership in the Latin Kings. Thus, the fact that "Rush" was a Latin Kings name added nothing new and the trial court did not abuse its discretion by allowing this evidence.

### Improper Closing Argument

Defendant next claims that he was denied a fair trial when the prosecution made closing arguments referring to defendant's escape for purposes other than for the limited purpose of showing his consciousness of guilt. Initially, we note, and defendant concedes, that this issue was not properly preserved for appellate review because his post-trial motion fails to set forth the specific remarks allegedly constituting error. Defendant nevertheless argues that we should consider this issue as plain error. 134 Ill. 2d R. 615(a). Under the doctrine of plain error, a reviewing court may consider an error not properly preserved at trial where the evidence is closely balanced or where the error was so fundamental and of such magnitude as to deny the defendant a fair trial. *People v. Miller*, 173 Ill. 2d 167, 191-92 (1996).

We decline defendant's invitation to consider this issue under the plain error rule. Most of the arguments defendant complains of were made in response to his counsel's own statements during closing arguments that defendant's escape may have been motivated, not by consciousness of guilt, but by unfair treatment or for "sport." Furthermore, the jury was instructed at the close of all evidence that evidence of escape was received on the issue of defendant's consciousness of guilt and was to be considered only for that limited purpose. Defendant's plain error argument consists of a single sentence in his reply brief asking this court to employ the plain error rule because his error was preserved, although imperfectly. Defendant, however, fails to argue that the evidence in this case was closely balanced nor does he attempt to explain why the magnitude of the error denied him a fair trial despite his own provoking of the State's arguments and the trial court's subsequent instruction to the jury. Accordingly, we find this issue waived.

*Improper Evidence of Prior Convictions*

Defendant next claims that he was denied a fair trial when the court permitted the prosecution to impeach him with his 1990 conviction of unlawful use of a weapon by a felon, which the court referred to as "felony offense of unlawful use of a weapon," and with his 1984 conviction for escape. Defendant argues that the court admitted evidence of both offenses without first balancing their probative value against their prejudicial impact as required by this court in *People v. Montgomery*, 47 Ill. 2d 510 (1971).

As the State correctly observes, this issue is waived because defendant failed to object at trial when the certified copies of his convictions were discussed and further failed to raise this issue in his post-trial motion. Moreover, defendant does not ask this court to review his claims under the doctrine of plain error.

Defendant, however, argues that defense counsel's failure to object constituted ineffective assistance of counsel. The rules governing the admission of evidence of prior crimes stem from this court's adoption of Federal Rule of Evidence 609 in *People v. Montgomery*, 47 Ill. 2d 510 (1971). Under *Montgomery*, a trial court may allow impeachment of a witness with any felony conviction, or any conviction involving dishonesty or false statement, so long as the witness' conviction or release was within the previous 10 years. *Montgomery*, 47 Ill. 2d at 516. Before any such evidence will be admitted, however, the trial court must determine whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. *Montgomery*, 47 Ill. 2d at 516.

Defendant claims the court failed to apply the *Montgomery* balancing test before admitting evidence of defendant's prior convictions. The record, however, belies defendant's claims. First, the trial judge specifically mentioned *Montgomery* by name when considering whether defendant's prior convictions were admissible.

While not dispositive, the judge's statements contradict defendant's contention that the record shows no consideration by the court of the relevant factors for and against admission of the evidence.

More importantly, the judge clearly did take steps to ensure defendant was not unduly prejudiced by declining defense counsel's request to introduce only the mere fact of defendant's prior felony conviction rather than mentioning the offense by name. The judge refused to do so on the basis that the jury could infer defendant was convicted of murder or some other more serious felony than unlawful use of a weapon by a felon. The trial judge also minimized the prejudicial impact of defendant's conviction by requiring the State to refer to it as "felony unlawful use of a weapon," thus removing the fact that defendant was already a felon when he committed the crime from the jury's consideration. Lastly, the judge demonstrated consideration of the previous convictions' prejudicial impact by insisting the State provide a limiting instruction telling the jury that it could only consider evidence of defendant's previous convictions as it may affect his believability and not as evidence of his guilt of the instant charges.

Although the trial judge did not explicitly state on the record that she was balancing the probative value of defendant's prior convictions against their prejudicial impact, this court has declined to find error when the transcript makes clear that the trial judge was applying the *Montgomery* standard, even though the judge did not expressly articulate it (see *People v. Williams*, 173 Ill. 2d 48, 83 (1996); *People v. Redd*, 135 Ill. 2d 252, 325-26 (1990)). We therefore reject defendant's claim that trial counsel was ineffective for failing to object at trial or in his post-trial motion because any such objection would have been unsuccessful. Consequently, defendant suffered no prejudice from trial counsel's failure to do so.

See *Strickland*, 466 U.S at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

### Barred Testimony

Defendant argues that the trial court denied him due process and a fair trial when it refused to allow him to testify as to an alleged promise made to him by Assistant State's Attorney Alesia that, if he cooperated as a witness against Guadelupe Aguilar, he would not be charged with murder. Defendant claims that this promise induced him to sign the handwritten statement in which he confessed to participating in the robbery which led to the murders of Chang and Myung Choi.

Several months prior to trial, defendant filed a motion to suppress his statement to police on the basis that it was involuntarily made. After a hearing, the court denied the motion. Defendant did not appeal from the trial court's ruling. At trial, defense counsel attempted on direct examination to elicit testimony from defendant regarding Alesia's alleged promise to him. The trial court refused to allow this line of questioning to proceed on the grounds that the matter of whether defendant's confession was voluntary was a matter properly litigated outside the presence of the jury, which had already been determined in the court's ruling on defendant's motion to suppress.

The admissibility of a confession that is challenged on the ground that it is involuntary is a matter for the trial court to determine out of the presence of the jury. *People v. Gilliam*, 172 Ill. 2d 484 (1996). In the instant case, the court ruled as a matter of law that defendant's statement was voluntary. Thus, the trial court properly prevented this matter from being again litigated in the presence of the jury.

Defendant, nevertheless, still has a right to present evidence to the jury regarding the credibility and weight to be given to the confession. Defendant claims the trial

court improperly limited his right to present his contention that the circumstances surrounding his confession rendered it not credible. A review of the record, however, demonstrates that, contrary to defendant's claims, he was not prevented from testifying as to the statement's credibility.

During his direct examination, defendant stated that, before he signed the handwritten statement, Assistant State's Attorney Alesia told him he would not be charged with murder, but that he would be charged with armed robbery. Defendant also read and showed to the jury the first line of his statement, which said the statement was taken regarding an "armed robbery and fatal shooting," which defendant claimed supported his belief that he was not charged with murder. Defendant further testified on direct examination that he did not participate in the robbery and that, before making his statement to police, he told them "the truth" about what happened. Additionally, defendant stated that he had been awake since 4:30 a.m. when he signed the statement at 5:15 p.m., and that Alesia told him if he cooperated, he would not be charged with murder. Defendant further related that he did not realize he had been charged with murder until his arraignment the next day. Furthermore, on redirect examination, defendant again testified that he signed the handwritten statement only after he was told he would not be charged with murder.

Given the extensive testimony by defendant as to the circumstances surrounding his confession to police, we find defendant's claim that the trial court improperly precluded him from testifying that prosecutors promised not to charge him with murder completely without merit.

## Sentencing Errors

### Eligibility

Defendant next contends that his sentence of death

must be vacated because the evidence was insufficient to find him eligible for the death penalty. Defendant waived his right to a jury for the purposes of sentencing. At the eligibility phase of his sentencing hearing, the court admitted into evidence defendant's birth certificate and the original jury verdicts finding him guilty of the first degree murders of Myung Choi and Chang Choi. Defendant presented no argument or evidence, and the trial court found him eligible for the death penalty on the basis of having committed two or more murders. The relevant statute states:

> "(b) Aggravating Factors. A defendant who at the time of the commission of the offense has attained the age of 18 or more and who has been found guilty of first degree murder may be sentenced to death if:
>
> * * *
>
> (3) the defendant has been convicted of murdering two or more individuals under subsection (a) of this Section *** regardless of whether the deaths occurred as the result of the same act or of several related or unrelated acts so long as the deaths were the result of either an intent to kill more than one person or of separate acts which the defendant knew would cause death or create a strong probability of death or great bodily harm to the murdered individual or another[.]"

Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(3).

Defendant contends that he is ineligible for the death penalty because the court made no finding and the State presented no evidence to support that he had either an intent to kill or that he performed any act which he knew would cause the death or strong probability of death or great bodily harm to any person. Initially, we note defendant has waived this issue by failing to object at the sentencing hearing or to raise it in his post-trial motion. Defendant, however, argues that trial counsel was ineffective for failing to do so. We disagree. Even if defendant had objected, any such objection would rightfully

have been overruled. At the guilt phase of defendant's trial, the jury was instructed as to the mental states of intentional, knowing and felony murder. The jury returned two general verdict forms finding defendant guilty of the murders of Chang Choi and Myung Choi. The jury's return of these general verdicts raises a presumption that it found defendant guilty of intentional murder. *People v. Johnson*, 149 Ill. 2d 118, 157 (1992), quoting *People v. Thompkins*, 121 Ill. 2d 401, 455-56 (1988).

Therefore, since the jury's verdict encompassed the necessary intent to find defendant eligible for the death penalty under the multiple murder aggravating factor, the trial court was not required to make additional findings regarding defendant's mental state when it entered defendant's jury verdict forms into evidence, and trial counsel was not ineffective for failing to raise this issue because defendant suffered no prejudice as a result. See *Strickland*, 466 U.S at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

### Unreliable Evidence in Aggravation

Defendant next argues that he was denied a fair sentencing hearing when the trial court admitted allegedly unreliable evidence in aggravation regarding his involvement in two other, unrelated shootings. First, defendant complains of testimony by Assistant State's Attorney Matthew Mahoney as to statements by two codefendants implicating defendant as the shooter in the 1991 murder and armed robbery of Gerardo Gonzalez. Defendant also complains of testimony by Detective George Tracy regarding statements made to him by a witness to the shooting. Lastly, defendant complains of testimony by Officer William Soraghan regarding defendant's involvement in the 1991 shooting of Artemio Garcia, a crime for which defendant was never charged.

The State argues that defendant has waived each of

the above claims of error by failing to properly object at trial. We agree. While defendant objected to the testimony of Assistant State's Attorney Mahoney and Detective Tracy on the grounds of hearsay, at no time did he object to any of the complained-of testimony on the grounds of unreliability. It is well settled that a specific objection to the admission of evidence waives all grounds not specified. See *People v. Lewis*, 165 Ill. 2d 305, 335-36 (1995). Furthermore, defendant failed to raise any objection at all at trial to the testimony of Officer Soraghan, although he did raise this issue in his post-trial motion. To preserve an issue for review, however, a defendant must both object at trial and specifically include the objection in a post-trial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Defendant's failure to do so renders this issue waived.

Defendant further claims that trial counsel was ineffective for failing to preserve these issues for review. After a review of the record, however, we believe that, even had defense counsel successfully objected to the evidence complained of, the outcome of defendant's sentencing would not have been different. Twenty-two witnesses testified for the State in aggravation, and a written statement was admitted into evidence from a twenty-third witness. In addition to testimony regarding the Gonzalez and Garcia shootings, the trial court heard extensive evidence of defendant's criminal history, which dated back to 1982. The court further heard testimony and accepted evidence regarding defendant's numerous disciplinary infractions while in prison, including testimony from a guard at Stateville Prison who stated that defendant had a reputation as a gang enforcer and hit man and was one of the "top five" worst inmates in terms of safety problems. Additionally, the court heard extensive evidence of three different escape attempts, which earned defendant the prison nickname "Houdini."

The record indicates that the trial court considered all of these factors in addition to defendant's participation in the Gonzalez and Garcia shootings in rendering its decision. In addition, the judge placed special emphasis on the facts surrounding the instant crimes, including that Mr. and Mrs. Choi were shot for apparently no reason, leaving two small children without parents. Given the substantial evidence in aggravation, we do not believe defendant suffered any prejudice as a result of counsel's failure to object or to preserve these issues in defendant's post-trial motion. See *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069. Accordingly, we reject defendant's ineffective assistance of counsel claim.

## Rebuttal Evidence

Defendant next claims he was denied his right to a fair sentencing hearing and to effectively present his defense when the trial court declined to read a trial transcript of Javier Chavez's testimony at defendant's 1992 trial for the murder of Gerardo Gonzalez prior to defense counsel's closing argument at sentencing. Although the court admitted the transcript into evidence, the judge stated that she would read its contents after the close of all the evidence when it was time for her to consider the evidence and render a sentencing decision. Defendant contends that the court's refusal to read the transcript on the spot impaired his ability to present a meaningful closing argument, rendering the sentencing hearing unconstitutionally unfair.

A review of the entire record, however, demonstrates that the trial court did consider the transcript, along with all other evidence presented in aggravation and mitigation, before rendering its sentencing decision. At the time defendant introduced the transcript into evidence and requested the judge to read it, the judge replied that she would do so, along with the transcripts of all testimony given during aggravation and mitigation,

at the appropriate time. Prior to closing arguments, the judge went on to say that, because of the seriousness of her decision, she intended to take matters home and go through them thoroughly, reviewing all trial testimony, exhibits and anything else relevant.

Nothing in the record indicates that the judge's decision to wait until after the close of evidence to read the transcript hindered her decisionmaking process or affected the fairness of the sentencing hearing in any way. The judge took nearly two weeks to render a sentence and, when the court reconvened, stated that the reason for the long delay was to allow her time to go back over all testimony presented in aggravation and mitigation as well as the exhibits received into evidence during the sentencing hearing. The court further made pains to explain the bases for its imposition of the death penalty, including its careful consideration of the aggravating and mitigating factors. Given the seriousness with which the trial court weighed these factors and its careful consideration of all the evidence, we do not believe defendant's right to a fair trial was violated by the court's decision to read the transcript of Chavez's testimony later, along with all the evidence presented, rather than before defendant's closing argument.

We further disagree with defendant's contention that the court's decision not to read the transcript at the time it was admitted into evidence impaired his closing argument. Defendant claims such reading was necessary because he made reference to the transcript in his closing argument and because it rebutted several allegedly inaccurate statements made by several witnesses who testified in aggravation for the State. In consideration of defendant's sentencing, however, the judge could easily refer to Chavez's testimony at the 1992 trial alongside transcripts of testimony given by the State's witnesses in aggravation and defendant's closing argument, and could

sort out any inconsistencies in the testimony at that time, which the record indicates is just what she did.

*Consideration of Improper Evidence in Sentencing*

Based on comments made by the trial judge when explaining the court's sentencing decision, defendant argues that the trial court improperly took into account the mere fact of his pending murder charge in the shooting of Gerardo Gonzalez without considering any evidence of the crime. Defendant also argues that the trial court's comments reveal that it improperly found defendant eligible for the death penalty on the additional bases of felony murder and murder of a witness to a crime. The State argues that defendant has waived this issue by failing to either object at trial or to raise it in his post-trial motion. We agree. Defendant has waived this issue. Moreover, defendant does not argue for application of the plain error doctrine nor does he claim that counsel was ineffective for failing to preserve this issue for review. Consequently, waiver applies.

*Use of Defendant's Prison Disciplinary Reports*

Defendant next argues that the State's use of prison disciplinary records as evidence in aggravation denied him a fair sentencing hearing because the records were unreliable hearsay. Defendant has failed to preserve this issue for review by failing to raise it in his post-trial motion. Moreover, this court has previously rejected such a claim, holding that the contents of prison incident reports are admissible during the penalty phase of a sentencing hearing so long as they are relevant and reliable. *People v. Armstrong*, 183 Ill. 2d 130 (1998); *People v. Jackson*, 182 Ill. 2d 30 (1998). Defendant's claims that the records were unreliable because they were based upon hearsay and double hearsay are further without merit because this court has also previously ruled that hearsay evidence is admissible at a capital sentencing hearing. See *Jackson*,

182 Ill. 2d at 83. We decline to revisit our decisions in these earlier cases.

### Constitutionality of the Death Penalty

Finally, defendant argues that his death sentence must be vacated and his case remanded for a sentence other than death because the Illinois death penalty statute is unconstitutional for a variety of reasons. In other cases, this court has considered and rejected the challenges raised by defendant, including his arguments that the death penalty statute (1) violates due process because the prosecutor is not required to give pretrial notice that he will seek the death penalty (see *People v. Evans*, 125 Ill. 2d 50, 99 (1988)); (2) permits arbitrary and capricious imposition of the death sentence because the prosecutor has complete discretion to request a death penalty hearing (see *People v. Orange*, 121 Ill. 2d 364, 390 (1988)); (3) impermissibly places the burden of proof and persuasion upon the defendant (see *People v. Thomas*, 137 Ill. 2d 500, 537-38 (1990); *People v. Pitsonbarger*, 142 Ill. 2d 353, 408 (1990)); (4) fails to provide sufficient information gathering procedures to ensure adequate appellate review (see *People v. Enoch*, 122 Ill. 2d 176, 203 (1988); *People v. Williams*, 97 Ill. 2d 252, 266 (1983)); (5) fails to provide a means to ensure that all aggravating factors relied upon by the sentencer are relevant and permissible (see *People v. Enoch*, 122 Ill. 2d 176 (1988); *People v. Guest*, 115 Ill. 2d 72, 111-12 (1986)); (6) contains a constitutionally vague and overbroad mitigating factor of " 'significant history of prior criminal activity' " (see *People v. Lewis*, 88 Ill. 2d 129, 144-45 (1981)); (7) does not permit the sentencer to give meaningful consideration to mitigation evidence because it mandates death whenever there is no mitigating factor sufficient to preclude it (see *People v. Page*, 155 Ill. 2d 232, 283 (1993)); (8) permits arbitrary and capricious imposition of the death penalty through an unconstitutionally vague

sentencing standard (see *People v. Spreitzer*, 123 Ill. 2d 1, 46 (1988)); (9) permits arbitrary and capricious imposition of the death penalty by allowing the sentencer to consider non-statutory aggravating factors (see *People v. Young*, 128 Ill. 2d 1, 59 (1989)); (10) results in arbitrary and capricious imposition of the death penalty from county to county depending on the predilections of the local prosecutor (see *People v. Stewart*, 123 Ill. 2d 368, 378-79 (1988)); (11) unconstitutionally places the State at an advantage by permitting it to argue first and last at the second phase of the sentencing hearing (see *People v. Armstrong*, 183 Ill. 2d 130, 162 (1998); *People v. Page*, 155 Ill. 2d 232, 282-83 (1993)); and (12) inevitably results in the execution of innocent persons (see *People v. Bull*, 185 Ill. 2d 179, 211-20 (1998); *People v. Brown*, 185 Ill. 2d 229, 260-61 (1998); *People v. Davis*, 185 Ill. 2d 317, 351-52 (1998)). We decline to revisit our earlier decisions, and accordingly reject defendant's arguments.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court is affirmed. We direct the clerk of this court to enter an order setting Wednesday, March 14, 2001, as the date on which the sentence of death, entered by the circuit court of Cook County, shall be carried out. Defendant shall be executed in the manner provided by law. 725 ILCS 5/119—5 (West 1996). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden of Tamms Correctional Center, and the warden of the institution where defendant is confined.

*Circuit court judgment affirmed.*

JUSTICE FREEMAN, specially concurring:

I write separately to express my views regarding the sufficiency of the evidence of defendant's death penalty eligibility.

Defendant maintains that the State failed to prove him eligible for the death penalty beyond a reasonable doubt because there was no evidence from which one could find that he had either the intent to kill any person or that he performed any act which he knew would cause death or create a strong possibility of death or great bodily harm to any person, as is statutorily required. According to defendant, "absent an individualized finding of intent to kill or alternatively separate acts which he knew would cause death or strong possibility of death or great bodily harm, his accountability for the murders does not make him eligible for death as a punishment."

The Illinois death penalty statute provides that at the eligibility phase of a capital sentencing hearing, the State has the burden to prove that a defendant is eligible for the death penalty beyond a reasonable doubt. Specifically, the State must show that the defendant was at least 18 years of age at the time of the commission of the offense and that at least one statutory aggravating factor exists. *People v. West*, 187 Ill. 2d 418 (1999) (and cases cited therein). In this case defendant's eligibility for the death penalty was predicated upon the statutory aggravating factor set out in section 9—1(b)(3) of the Criminal Code of 1961. Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(3). That section authorizes the imposition of the death penalty where "the defendant has been convicted of murdering two or more individuals" and "the deaths were the result of either an intent to kill more than one person or of separate acts which the defendant knew would cause death or create a strong probability of death or great bodily harm to the murdered individual or another." Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(3). This court has held that section 9—1(b)(3) allows the death penalty to be imposed where the defendant acted with knowledge that his acts would result in death or great bodily harm, or with the intent to kill. *People v. Davis*, 95

Ill. 2d 1, 31-36 (1983). This means that, at the eligibility phase of the hearing, the State is required to prove beyond a reasonable doubt not only defendant's conviction for two or more murders, but also a culpable mental state, *i.e.*, intent or knowledge at the time of those crimes. *People v. Edgeston*, 157 Ill. 2d 201, 224 (1993). This court has ruled that the " 'conviction' element" of section 9—1(b)(3) is satisfied where there is proof that a trial judge has entered judgment on a verdict of guilty of murder. *People v. Hope*, 168 Ill. 2d 1, 37 (1995). However, whether "the defendant acted with the requisite mental state is a separate issue." *Hope*, 168 Ill. 2d at 37.

I note that, at the conclusion of the guilt phase of defendant's trial, the jury was instructed based on theories of intentional, knowing, and felony murder and on accountability. The jury returned a general verdict of guilty with respect to first degree murder. Therefore, we do not know beyond a reasonable doubt that the jury agreed unanimously on the question of defendant's *mens rea*. Nevertheless, the jury's verdict, when viewed in conjunction with all of the evidence adduced at the trial which the trial judge heard, can form the basis for affirming, on appeal, the trial judge's specific finding of death eligibility at sentencing. I reach this conclusion because, in this case, the trial judge, and not a jury, served as the trier of fact during the sentencing hearing. See *People v. Johnson*, 149 Ill. 2d 188 (1992); *People v. Woolley*, 178 Ill. 2d 175 (1997). The trial judge knew of the specific elements required under section 9—1(b)(3) for a finding of death eligibility. Moreover, the judge, as the trier of fact, may infer the intent to take a life from a defendant's acts and the circumstances surrounding the commission of the offense. *People v. Garcia*, 97 Ill. 2d 58, 85 (1983).

This court has previously held that the death penalty may be constitutionally imposed for murder convictions

based on accountability. *Ruiz*, 94 Ill. 2d at 263. Even though defendant may not have been the actual shooter, the evidence shows that, at the very least, he planned and actively participated in the crimes at issue. Although there was no direct evidence that it was defendant who shot the victims, I believe that the proof adduced at trial was sufficient to sustain the sentencing judge's finding of death eligibility under the principle of accountability. This conclusion is amply supported by the evidence heard by the trial judge that was adduced during the guilt phase of the proceedings (see *People v. Bull*, 185 Ill. 2d 179, 208-09 (1998), citing *People v. Harris*, 182 Ill. 2d 114, 163-64 (1998) (Freeman, C.J., specially concurring)), as I explain in detail below.

The evidence adduced at trial established that defendant first met his codefendant, Aguilar, while both were imprisoned at Stateville several years earlier. They became reacquainted in January 1989 and met on two occasions between January 1989 and the time of the murders on February 24, 1989. It was during this period that defendant informed his girlfriend, Patty, that he wanted to get a gun. The night before the murders, defendant and Aguilar met at a lounge, and, afterward, they both went to Patty's apartment, where defendant had been living. Aguilar spent the night at the apartment. The next day, Aguilar and defendant walked to the jewelry store, which was close in proximity to Patty's apartment. Defendant told police that he and Aguilar had to be "buzzed" in and out of the store because the door was locked electronically. Defendant stated that the sole purpose of this visit was to "case" the store, that is, to look for security and to see whether it was easy to rob. After examining some jewelry, both Aguilar and defendant left, but returned a short time later with the intention to commit a robbery. Defendant told police that as they entered the store, Aguilar told him to "keep [his]

eyes open," which meant to defendant that something was going to happen. Defendant further admitted that while Aguilar was examining a piece of jewelry, defendant stayed at the front of the store, acting as a lookout. Defendant stated that he then heard a pop and saw that Aguilar had shot the male victim and was chasing the female victim to the back of the store. Defendant was alongside Aguilar when Aguilar first attempted to shoot the woman, but the gun jammed. Aguilar cleared the gun and successfully shot the woman a few moments later. Defendant and Aguilar then took numerous trays of jewelry and left the store through a rear door, removing barricades to do so. They returned to Patty's apartment, where they emptied the trays onto a bed. Soon thereafter, Patty returned to home and, upon seeing the jewelry, told defendant and Aguilar to leave the premises. Defendant stated that he then went to Patty's car, which she had parked in front of the jewelry store. According to defendant, the area was swarming with police activity, and he approached a police officer and asked "What's going on?" The officer replied that a robbery had taken place, and defendant asked "Was anyone hurt?" The officer replied that he did not know. Defendant told police that he then drove himself and Aguilar to the home of defendant's sister, where the men spent the night. Aguilar gave defendant his share of the jewelry there. Patty testified that about a month after the crimes, defendant called her and she asked him if he committed the robbery and murders. Defendant responded that she should not ask him any questions. Defendant never told her that he was afraid of Aguilar or that he had nothing to do with the crimes.

With respect to the *mens rea* required for death eligibility under section 9—1(b)(3), the intent to take a life may be inferred from a defendant's acts and the circumstances surrounding the commission of the offenses.

*Ruiz*, 94 Ill. 2d at 263. Applying this rule to the facts of this case, the proof adduced at the guilt phase of the trial is sufficient to sustain the sentencing judge's finding of death eligibility under the principle of accountability. The can be no question that defendant was a principal actor in a common enterprise bent upon committing acts of violence upon the victims. After becoming reacquainted with Aguilar, defendant expressed the desire to get a gun. Defendant and Aguilar planned to rob the store and, to this end, "cased" the premises to see what type of security devices were present. It is uncontradicted that the store's door was electronically locked, and that the only apparent way to enter or exit the premises was to be "buzzed" in or out by the store's owners. This fact supports the inference that, once defendant and Aguilar departed the store after casing the premises, they intended to use lethal force, or, at the very least, had knowledge that lethal force would have to be employed to escape after robbing this particular location. It is difficult to conceive that the owners of the jewelry store, after having been robbed, would have freely and voluntarily buzzed defendant and Aguilar out of their store without threat of lethal force. In addition, defendant testified that despite being informed by Aguilar to "keep [his] eyes open" upon entering the store (meaning that something was about to happen), defendant neither protested nor withdrew from their common enterprise. To the contrary, defendant went along with the plan and acted as a lookout.

Further, defendant testified that after the first victim was shot, defendant helped Aguilar chase the second victim into the back room and watched as Aguilar attempted to shoot her. Even though the gun jammed, providing defendant with an opportunity to protest Aguilar's actions or withdraw from any further involvement, defendant chose to remain at Aguilar's side as he cleared

the gun and then shot the victim on his second attempt. Defendant then helped Aguilar take trays of jewelry from the store to Patty's apartment. When she told them to leave, defendant retrieved Patty's car, which was parked in front of the jewelry store. During this time, defendant engaged a police officer in conversation. Although the conversation presented defendant with the opportunity to admit his involvement in the crimes and to seek protection from Aguilar because of defendant's fear for his own safety, he did not do so. Rather, the evidence reveals that defendant, on his own initiative, suggested that both he and Aguilar seek refuge at the home of defendant's sister. If, as defendant suggests here on appeal, he was unaware that Aguilar would use lethal force, it is highly unlikely that defendant would subject his sister and her family to possible harm by bringing Aguilar, who was still armed, into their home. Finally, the evidence reveals that two men split the robbery proceeds as soon as they had successfully evaded police.

Under section 9—1(b)(3), the sentencing judge had to find, beyond a reasonable doubt, that the deaths were "the result of either an intent to kill more than one person or of separate acts which the defendant knew would cause death or create a strong probability of death or great bodily harm to the murdered individual or another." The evidence that I have outlined above, at the very least, establishes that defendant knew that the acts would cause death or create a strong probability of death or great bodily harm. This conclusion is especially true under the standard of review here, which requires that the evidence be examined in a light most favorable to the prosecution.

I believe the foregoing analysis is more responsive to defendant's sufficiency of the evidence claim than that offered by the court today. The court rejects defendant's *mens rea* contention, noting that, at the conclusion of the

guilt phase, the jury returned a general verdict finding defendant guilty of the murders of Chang and Myung Choi. According to the court, these general verdicts raise a presumption that the jury found defendant guilty of intentional murder. Therefore, "since the jury's verdict encompassed the necessary intent to find defendant eligible for the death penalty under the multiple murder aggravating factor, the trial court was not required to make additional findings regarding defendant's mental state when it entered defendant's jury verdict forms into evidence, and trial counsel was not ineffective for failing to raise this issue because defendant suffered no prejudice as a result." 195 Ill. 2d at 461.

I find the court's use of the presumption, as described above, troublesome on many levels. As an initial matter, it now appears that every general verdict returned by a jury at the conclusion of the guilt phase is, for purposes of death penalty eligibility, automatically transmuted into a finding that the defendant is guilty of intentional murder. This type of practice in cases in which the death penalty has been imposed is, in my view, unwise. Where the ultimate penalty is to be imposed, this court should not be satisfied of proof beyond a reasonable doubt by resort to a presumption. In this case, the most that can be said is that the general verdict returned by the jury, on its face, fails to reveal whether the jury found defendant guilty of felony murder or guilty of intentional or knowing murder based on accountability for the action of Aguilar. The verdict does not prove, beyond a reasonable doubt, the existence of the *mens rea* required under section 9—1(b)(3).

In my view, by employing the presumption to defeat defendant's sufficiency of the evidence challenge, the court renders the eligibility phase of a capital sentencing hearing a relatively meaningless exercise. In enacting the Illinois death penalty statute, the General Assembly cre-

ated a two-phase capital sentencing scheme. At the first, eligibility, stage of the hearing, the State is required to prove the elements of the aggravating factor, including, where applicable, the *mens rea* necessary for death eligibility. The statute allows for a defendant to present evidence during this phase of the hearing. Therefore, the fact that a defendant may present evidence on the question suggests that a general verdict of guilty, in the context of section 9—1(b)(3), does not create an irrebuttable presumption of death eligibility. I must point out that the death penalty statute does not speak in terms of presumptions. It places a burden of proof upon the State to prove the elements required for death eligibility beyond a reasonable doubt. The court today seemingly forgets that the issues to be decided at the culpability trial differ from those to be decided for death eligibility. Not all those convicted of murder may be found eligible for the death penalty. The court, by allowing a presumption alone to satisfy proof beyond a reasonable doubt, minimizes the very real fact that the State bears anew the burden of proving the required *mens rea* at the first stage of the capital sentencing hearing.

I also believe the court's use of the presumption, as set forth in its discussion, raises constitutional issues that are best avoided. This court has noted that the United States Supreme Court has warned against the use of presumptions that absolve the State of proving the question of intent beyond a reasonable doubt because of the due process concerns involved. See *People v. Watts*, 181 Ill. 2d 133 (1998) (and federal cases discussed therein). Moreover, as I mentioned previously, the issues to be decided at the guilt phase of the trial differ from those to be decided for death eligibility, and not all those convicted of murder may be found eligible for the death penalty. A capital sentencing scheme must provide a " 'meaningful basis for distinguishing the few cases in which [the

penalty] is imposed from the many cases in which it is not.' " *Gregg v. Georgia,* 428 U.S. 153, 188, 49 L. Ed. 2d 859, 883, 96 S. Ct. 1909, 2932 (1976), quoting *Furman v. Georgia,* 408 U.S. 238, 313, 33 L. Ed. 2d 346, 392, 92 S. Ct. 2726, 2764 (1972) (White, J., concurring). The United States Supreme Court has recognized that the eligibility phase of a death sentence hearing plays a "constitutionally necessary" function by "circumscrib[ing] the class of persons eligible for the death penalty." *Zant v. Stephens,* 462 U.S. 862, 878, 77 L. Ed. 2d 235, 250-51, 103 S. Ct. 2733, 2743 (1983). This phase of the hearing safeguards against arbitrary and capricious sentencing because it reasonably justifies the narrowing of the class of persons convicted of murder who are eligible for the death penalty. *Zant,* 462 U.S. at 874-77, 77 L. Ed. 2d at 248-50, 103 S. Ct. at 2741-42. In the past this court, too, has echoed these same concerns by noting that "[a]ggravating factors serve as necessary prerequisites without which the death sentence cannot be imposed; they delineate the borderline between those cases in which death is a possible punishment and those in which it cannot be considered." *People v. Lewis,* 88 Ill. 2d 129, 145 (1982); see also *People v. Ramey,* 151 Ill. 2d 498, 544 (1992); *People v. Simms,* 143 Ill. 2d 154, 170 (1991). The use of presumptions in the manner endorsed by the court today does little, in my mind, to "delineate the borderline between those cases in which death is a possible punishment and those in which it cannot be considered" and amounts to little more than appellate "rubberstamping."

In all other respects, I concur in the opinion of the court.

JUSTICES McMORROW and RATHJE join in this special concurrence.

CHIEF JUSTICE HARRISON, concurring in part and dissenting in part:

I agree that Casillas' murder conviction should not

be disturbed. In my view, however, his sentence of death cannot be allowed to stand. For the reasons set forth in my partial concurrence and partial dissent in *People v. Bull*, 185 Ill. 2d 179 (1998), the Illinois death penalty law violates the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) and article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, § 2). Casillas' sentence of death should therefore be vacated and he should be sentenced to a term of imprisonment. 720 ILCS 5/9—1(j) (West 1996). Because Casillas was found guilty of murdering more than one victim, the term of his imprisonment must be natural life. 730 ILCS 5/5—8—1(a)(1)(c)(ii) (West 1996).