2020 IL App (1st) 180471-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

SECOND DIVISION
September 29, 2020

No. 1-18-0471

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 16-CR-16629 |
| | ) | |
| JERRY WILLIAMS, | ) | The Honorable |
| | ) | Dennis J. Porter, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Pucinski and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held:* (1) Defendant forfeited argument that trial court erred in failing to suppress gun on the basis that he set it on the ground only in response to an unlawful seizure by police officers, where defendant never raised this issue in the trial court. (2) Defendant's recanting of request for counsel and statement of intent to remain *pro se* did not constitute second waiver of counsel requiring readmonishment by trial court. (3) Although defendant forfeited issue that trial court erred in admitting document from Illinois State Police, any error in admission was harmless.

¶ 2    Defendant Jerry Williams was charged with four counts of aggravated unlawful use of a weapon (AUUW) and two counts of unlawful use or possession of a weapon by a felon, arising out of events that occurred on October 19, 2016, on the 5500 block of West Quincy Street in

Chicago. Following a bench trial, defendant was convicted of the six charged offenses, all of which merged into count one. Defendant was sentenced to five years in the Illinois Department of Corrections. On appeal, defendant argues that the trial court erred in (1) denying his motion to suppress evidence of a firearm; (2) failing to admonish him regarding waiver of counsel; and (3) admitting a document from the Illinois State Police stating he had never been issued a Firearm Owner's Identification (FOID) card or license to carry a concealed firearm. For the following reasons, we affirm defendant's conviction.

¶ 3                              I. BACKGROUND

¶ 4                A. Waiver of counsel and admonitions at arraignment

¶ 5        At defendant's arraignment on November 15, 2016, he informed the trial court that he intended to waive his right to counsel and represent himself *pro se*. The trial court then engaged in the following inquiry and admonishments to confirm that the waiver was knowing and voluntary. It asked defendant whether he had ever previously represented himself in a criminal case, and defendant confirmed that he had. The trial court inquired about defendant's level of education, and defendant stated that he had completed several trades and college. The trial court explained to defendant the six offenses that he was charged with, largely quoting the language used in the indictment. After doing so, the trial court asked defendant if he understood what he was charged with, and defendant agreed that he did.

¶ 6        Next, the trial court explained to defendant that, on the four charges for AUUW, the State was seeking to sentence him as a class 2 offender based on his previously felony conviction. It explained that this meant that on each charge, if he was convicted, he must be sentenced to a term in the penitentiary of between 3 and 14 years, followed by 2-year term of mandatory supervised release. The trial court explained that the counts for unlawful use or possession of a weapon by a

felon were class 3 felonies, and if he was convicted he must be sentenced to a term in the penitentiary of between 2 and 5 years, followed by a 1-year term of mandatory supervised release. It further informed him that on each count he was subject to a possible fine of up to $25,000. It also explained in detail that there were certain factors, such as his having prior felony convictions, that could result in a longer sentence. After explaining the possible penalties for the offenses with which defendant was charged, the trial court asked defendant if he understood those penalties. Defendant confirmed that he understood them.

¶ 7        The trial court explained to defendant that he was entitled to have a lawyer represent him. It explained that he could choose his own lawyer, that the court would appoint a public defender to represent him at no cost if he could not afford to hire his own lawyer, and that he had the right to represent himself. The trial court told him that most people would agree that it was not a good idea to represent himself, but he had that right. Defendant answered that he understood these rights, but he did not trust a public defender. The trial court then told defendant that presenting a defense involved observing various technical rules of evidence governing the conduct of trial. It reminded him that a prosecutor was experienced at trials, and a person who was inexperienced might allow the prosecutor an advantage by failing to raise proper objections, failing to effectively question jurors, or otherwise making tactical decisions that could produce adverse consequences later in the case. The trial court informed defendant that he would be required to follow these rules, whether he knew them or not, and the trial court would not serve as his lawyer. It informed him that his ability to present a defense could be diminished by the fact that he was taking on dual roles of being both the accused and his own attorney. It informed him that an attorney could assist him and the court by evaluating defenses, consulting with the prosecutor about reduced charges or penalties, or presenting evidence that might lead to a lesser sentence. It informed defendant that

once the trial started, he could not change his mind about representing himself, and that it was unlikely the court would appoint standby counsel. The trial court confirmed that defendant understood all of these things. At the conclusion of its admonishments, the trial court asked defendant whether he still wished to represent himself after hearing what the trial court said, and defendant confirmed that he still wanted to represent himself.

¶ 8                    B. Motion to quash arrest and suppress evidence

¶ 9        On May 10, 2017, defendant filed a motion to quash his arrest and suppress evidence. In his written motion, he argued that the police officers who responded to the 5500 block of West Quincy Street on the night at issue lacked probable cause or reason to believe that a crime had been or was about to be committed. He argued that the unknown person who made the 911 call to which they were responding had simply reported an armed person. He argued the caller did not report "that the armed person was 'illegally' armed without a valid FOID card, a valid [concealed carry license] or was involved in any criminal activities." Defendant argued the officers failed to investigate whether the caller, who was anonymous, was credibly reporting an actual offense. He argued that his conduct prior to arrest was not something that could reasonably have been interpreted by police officers as constituting probable cause that he was about to commit a crime.

¶ 10       On June 1, 2017, the trial court held a hearing on defendant's motion. The trial court received testimony from Chicago Police Department Officers Everardo Bracamontes, Juan Duran, and Bob Ruiz, and from defendant. The trial court also reviewed body-camera footage of the incident from the three officers.

¶ 11       Upon questioning by defendant, Officer Bracamontes testified that on the night at issue, the three officers responded to a "person with a gun call" on the 5500 block of West Quincy Street. He agreed that the call was from an anonymous source, and there was no report that the person

with the gun lacked a valid FOID card or concealed carry license. He then clarified that there were actually several 911 calls concerning the same area about a minute apart. One caller reported that a group of about 20 individuals was causing a commotion. The caller described a "male black, black skullcap, black jogging pants and a black-and-white jacket; male black, black skullcap, black pants, both have hand guns and are in the front with a group of other males." Officer Bracamontes described another caller who reported overhearing "that the same group was about to start shooting." He agreed that he could not investigate whether the callers were telling the truth, because they were anonymous, and he could not talk to them.

¶ 12    All three officers testified that when they arrived at the scene, there were only about 6 or 7 individuals present, not 20. Officers Duran and Ruiz testified that several of the men fled on foot when the officers approached them, and the officers briefly chased after them.

¶ 13    Officer Bracamontes testified that upon his arrival at the scene, he observed defendant place a silver semiautomatic handgun on the ground by a gutter in front of the building at 5526 West Quincy. When he observed this, Officer Bracamontes was standing on the sidewalk in front of that building. The yard there was gated, and he was outside the gate. He testified that he stayed on the sidewalk and followed defendant to the point where he exited the yard, at which point he detained defendant. He explained that defendant did not exit through the same gate at which he had entered the yard. Rather, he exited through the next gate east, which was at 5522 West Quincy. Officer Bracamontes testified that the reason he did not enter the same yard where he saw defendant put the gun down was because after defendant did so, defendant began to walk eastbound. Thus, Officer Bracamontes did not want to walk west to go inside the yard, so he followed defendant east. He testified that he shouted "hey," at which point defendant stopped and Officer Bracamontes grabbed him. This occurred on the sidewalk in front of 5522 West Quincy. Shortly after detaining

defendant, Officer Bracamontes learned from defendant that he did not have a concealed carry license or a FOID card. He also later learned from his fellow officers that they had discovered a gun in the area where he had seen defendant place it.

¶ 14    Officer Ruiz testified that after briefly chasing the individuals who had fled, he returned to the scene and observed that Officer Bracamontes had seized defendant. Officer Bracamontes directed Officer Ruiz to search the yard of 5526 West Quincy, because he believed defendant had hidden something in the yard. He agreed that Officer Bracamontes never told him that what he was searching for was a gun. He testified that during the time period in which this incident occurred, the police had been having a lot of problems with crime in that area. He testified he started searching the yard with his flashlight before Officer Bracamontes directed him specifically where to look.

¶ 15    The final witness to testify at the hearing was defendant. Defendant testified that on the night at issue, he was on the 5500 block of West Quincy when several Chicago police officers arrived. When they arrived, defendant "attempted to flee the area," but he could not because the officers were giving chase after three or four individuals fled east and a few more fled west. Defendant proceeded to walk east and observed several officers there. He testified that once the officers arrived on the street, before they got out of the car, they were yelling threats such as, "Don't move or I'm going to Tase you!" Defendant observed several individuals that were on the block being seized and searched by the responding officers. Defendant testified that "out of fear," he attempted to get away from that street by entering the front yard of 5526 West Quincy and attempting to exit through the gangway's gate. However, he could not do so because the gate was locked. Thus, he turned around and exited out of the yard.

¶ 16     Defendant testified that as he exited the yard, he did not see anybody to the east, south, or west of the gate or yard of 5526 West Quincy. He was the only one walking. Once he walked past the next building east, 5524 West Quincy, he was detained by Officer Bracamontes at approximately 5522 West Quincy. Before placing restraints on defendant, Officer Bracamontes asked him what he was doing in the yard. Defendant responded, " 'I did nothing. What are you stopping me for? Am I under arrest?' " Officer Bracamontes then placed restraints on defendant and said to Officer Ruiz, " 'Search the yard over there. I believe I [*sic*] hid something in there.' " Defendant testified that Officer Ruiz then began searching the front yard, and Officer Bracamontes then directed him to search the gangway. Defendant testified that Officer Bracamontes never directed Officer Ruiz to the gutter. Defendant testified that Officer Bracamontes' body cam shows that he asked the officer who recovered the firearm where he had recovered it. He asked, " 'Did you find it by the gutter or did you find it by the meter?' " Defendant testified that the gutter and meter were 3 feet apart. Officer Ruiz responded that he found it by gutter. Officer Bracamontes then wrote this answer down on a piece of paper.

¶ 17     On cross-examination, defendant confirmed that some of his testimony consisted of things he had interpreted from watching the officers' body-camera footage, and his testimony did not consist entirely of things that he observed that day. Defendant confirmed that he did go into the yard at 5526 West Quincy on the night at issue. He testified that he did not have a FOID card or a concealed carry license on that date. Defendant testified that the reason he went into the yard at 5526 West Quincy was to get away from the police officers, whom he heard say, " 'Don't move! I'm going to Tase you! Stay right there! Stay right there! I'm going to Tase you!' " Defendant stated that he "stood there for awhile" and watched what was taking place, and he observed the officers stopping and searching more than one individual.

¶ 18    Defendant was then asked if that was when he had placed the handgun by the gutter, and he denied having ever possessed a handgun that night. He testified as follows:

"Q. And just to be clear, you're saying right now for the purposes of this motion, that that was not your gun, that you did not put a gun down at 5526 West Quincy?

A. The defendant is stating that your question is vague. You said at 5526. Where at 5526?

Q. Well, did you have a handgun at all on that night at around 10:10 p.m.?

A. No, I did not.

Q. Okay. So when you went into that address of 5526 West Quincy to get away from the police, did you have a handgun on you then?

A. You asked the same question. No, I did not.

Q. Did you have a handgun on you when you bent down by the gutter that night at 5526 West Quincy?

A. I never did bend down by the gutter.

Q. Okay. And you never had a handgun; correct?

A. I never had a handgun."

¶ 19    Defendant then rested. The State made a motion for a directed finding, arguing that the fact that defendant denied possessing the recovered handgun meant that he had no possessory interest in the object the State intended to use at trial. Defendant argued that it was impossible for Officer Bracamontes to have been close enough to have observed a crime.

¶ 20    After hearing arguments, the trial court denied defendant's motion. It reasoned that the evidence had shown that the weapon in question was recovered from the ground after it had been

placed there, and thus no illegal search had occurred. It found that defendant had not established any expectation of privacy in the area searched or the property seized, and therefore there had been no violation of defendant's constitutional rights.

¶ 21    C. Defendant's request for counsel and subsequent decision to proceed *pro se*

¶ 22    At the conclusion of the above hearing on the motion to suppress evidence and quash arrest, the trial court asked defendant whether he wanted a bench trial or a jury trial. The following colloquy then occurred:

> "THE DEFENDANT: The defendant would like to go to jury. The defendant decide to step down *pro se*. The defendant would like to step down *pro se*.
>
> THE COURT: You want a lawyer?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: All right. The Public Defender will be appointed. They're not here now. *** I'm going to put your case over till tomorrow and then you can have your lawyer meet with you again.
>
> All right. Public Defender appointed. It will be by agreement to tomorrow, which is June 2nd."

¶ 23    No further proceedings occurred until the following morning, June 2, 2017, when the following colloquy took place as soon as the case was called:

> "THE COURT: Mr. Williams was representing himself. Yesterday he had some motions and he asked the public defender be reappointed.
>
> MS. POLAK [(ASSISTANT PUBLIC DEFENDER)]: Judge, I just spoke to Mr. Williams and he told me that he does not want the services of the public defender.

THE COURT: What happened?

MS. POLAK: I don't know.

THE COURT: Yes, Mr. Williams?

THE DEFENDANT: The defendant would like to proceed *pro se*.

THE COURT: You want to continue *pro se*?

THE DEFENDANT: Yes, sir.

THE COURT: I thought you said—yesterday you said you wanted a lawyer.

THE DEFENDANT: No, I recant that. I think about it. I know my case better than anyone. And the fact that—I believe—

THE COURT: Okay. All right. You want to stay *pro se*. That's fine."

¶ 24    The trial court did not give the defendant any admonishments concerning his decision to proceed *pro se* at that time. The defendant represented himself for the duration of the proceedings in the trial court. The defendant ultimately concluded that he wanted a bench trial, which occurred on August 2, 2017.

¶ 25                                        D. Trial

¶ 26    The trial began with the publishing of certain body camera footage of the officers involved, which was admitted into evidence upon stipulation. In one of the videos, one of the officers inside the squad can be heard can be overheard saying, "I'm gonna tase you! I'm gonna tase you! Pull out the Taser, pull out the Taser! I'm going to f***ing tase you, Joe!"

¶ 27    The first trial witness was Officer Bracamontes, who testified that he arrived on the 5500 block of West Quincy with his partners, Sergeant Roman, Officer Ruiz, and Officer Duran, in response to 911 calls. He observed a group of black men on the north side of the street. The men

started walking fast, and one individual from the group started to run. One of the other officers chased the individual who had run, but Officer Bracamontes remained at the location and watched the group. He then saw defendant, who had been one of the men in the group, enter the front yard of a residence at 5526 West Quincy and place what he believed to be a handgun on the ground on the side of the front of the building. Officer Bracamontes was then about 15 feet away from defendant. Defendant then left the yard and exited onto the sidewalk in front of 5522 West Quincy. Officer Bracamontes stopped defendant and asked him if he had a concealed carry license or FOID card. Defendant said no. Officer Bracamontes then walked defendant to the squad car. He also directed Officer Ruiz to search the yard where he had seen defendant place the gun down. Officer Bracamontes saw the handgun later, and it appeared to be the same object that defendant had placed on the ground.

¶ 28     On cross-examination, defendant challenged whether Officer Bracamontes could have seen him place the gun in the yard from the vantage point he claimed he had. Officer Bracamontes explained that the reason he did not immediately go into the yard at 5526 West Quincy was because he was waiting to see what defendant did after putting the gun down, and he could have lost his advantage on defendant if he had gone through the gate at 5526. Officer Bracamontes admitted that he failed to turn his body camera on until he was walking defendant back to the squad car. He also acknowledged that no other officer saw defendant with a gun.

¶ 29     The next witness was Officer Ruiz, who testified that when he and other officers arrived at the scene, he saw a group of males who started to walk away as the officers approached. When the officers exited the car, they started running. Officer Ruiz detained one of the men. A few seconds later, he saw Officer Bracamontes detaining defendant. Officer Bracamontes told him that defendant had put something in the yard. He entered the yard where Officer Bracamontes directed

him. Near a gutter spout, he found a firearm, which Officer Duran then recovered. He testified that it was raining, but the gun was dry. The gun was loaded. He accompanied Officer Duran back to the police station and saw him inventory it. On cross-examination, Officer Ruiz agreed that Officer Bracamontes had not used the word "gun" when directing him into the yard, nor did he specifically tell him to look for it by the gutter. After Officer Ruiz found the handgun, Officer Bracamontes asked him if he found the handgun by the gutter or by the meter.

¶ 30      Before resting, the State offered a certified copy of a notarized document from the Illinois State Police stating that as of December 20, 2016, defendant had never been issued a FOID card or concealed carry license. Defendant objected on the grounds that this "information was not provided before the officers responded to the 5500 block of West Quincy." The trial court overruled defendant's objection. The State also introduced into evidence a certified copy of defendant's prior felony conviction. The State then rested.

¶ 31      In the defense case, defendant testified that when the police arrived on the night at issue, about three or four individuals ran toward Lotus Street, and two or three ran toward Central Street. The police gave chase after both groups. Defendant walked and entered the yard at 5526 West Quincy Street. He was attempting to exit the chaos and commotion that was going on. He attempted to exit through the gangway gate, but it was locked. He then exited out of the gate at 5526 West Quincy, and he did not see Officer Bracamontes anywhere in sight. Defendant proceeded east, and he was approached from behind by Officer Bracamontes in front of 5522 West Quincy. The officer asked him what he was doing coming out of the yard. Defendant answered, " 'I did nothing, what are you stopping me for?' " The officer then handcuffed defendant. As he was doing so, Officer Ruiz walked up, and Officer Bracamontes directed him to search the yard of 5526 West Quincy. He never specifically directed him to recover a handgun but simply stated, " 'there, there.' "

¶ 32    On cross-examination, defendant confirmed he did not have a FOID card or a concealed carry license on the date at issue. He did not live at 5526 West Quincy or at 5522 West Quincy. He had two different relatives that lived on that street, but those relatives did not live at either of those residences. He testified he was trying to get away from police because they had been threatening to use their Tasers, and he was scared because some Chicago police officers like to commit illegal activities. After he testified, defendant rested.

¶ 33    At the conclusion of evidence and argument, the trial court found defendant guilty on count one, which was for class 2 AUUW. It merged counts two through six into count one. Defendant filed a motion for new trial, which the trial court denied. Defendant was then sentenced to five years in the Illinois Department of Corrections. This direct appeal followed.

¶ 34                                II. ANALYSIS

¶ 35                        A. Denial of motion to suppress evidence

¶ 36    Defendant's first argument on appeal is that the trial court erred in denying defendant's motion to suppress evidence of the handgun found in the yard at 5526 West Quincy, because the police officers' discovery of the gun was the fruit of an illegal seizure. He contends that the police illegally seized him when, upon their arrival at the scene, they threatened to use their Tasers on him and the other men, despite having no probable cause or reasonable suspicion to believe that a crime had been or was about to be committed. Thus, he contends, it was only in response to these unlawful police threats that he acted out of fear for his physical safety, by placing his gun on the ground in a yard where the police quickly discovered it. He therefore argues he did not voluntarily abandon the gun prior to his seizure by police.

¶ 37    The State argues that defendant has forfeited this issue by failing to raise it in the trial court during the motion to suppress or in his motion for a new trial. "To preserve an issue for review, a

party ordinarily must raise it at trial and in a written posttrial motion." *People v. Cregan*, 2014 IL 113600, ¶ 15. Defendant disputes that this issue was forfeited and argues that he sufficiently raised this issue in the trial court as a *pro se* litigant. He alternatively argues that, as the issue involves constitutional grounds, it is an issue he could raise in a postconviction petition, and therefore this court should simply review it on direct appeal as a matter of judicial economy. See *id.* ¶ 18. The State contends that this exception to forfeiture only applies to "constitutional issues that were properly raised at trial and may be raised later in a postconviction petition" (see *id.* ¶ 16), and the constitutional issue defendant is asking this court to review was not properly raised at trial. We agree with the State that the issue that defendant is advancing on appeal was not raised in the trial court, and for that reason defendant has forfeited review of it.

¶ 38    In the trial court, defendant's motion to quash his arrest and suppress evidence was premised upon the factual basis and legal theories that (1) that the officers who responded to the 5500 block of West Quincy lacked probable cause to believe that a crime had been or was about to be committed; and (2) Officer Bracamontes did not actually see defendant place a handgun in the yard of 5526 West Quincy and therefore lacked probable cause to arrest him.

¶ 39    As to the first basis of defendant's motion, defendant—in his written motion, questioning of police witnesses, testimony, and argument at the hearing—attempted to show that the 911 call to which the police were responding was simply a report of an armed person, not a report that the person lacked a FOID card or concealed carry license to legally carry a firearm. His questioning of witnesses indicated an attempt to show that the caller had not actually reported criminal conduct. He further argued and attempted to show at the hearing that the caller to 911 was anonymous and had not provided reliable information to the police, and that the police had done an insufficient investigation of the information provided by the caller prior to arriving at the scene.

¶ 40     As to the second basis, defendant's questioning of witnesses and argument at the hearing shows an attempt to undermine Officer Bracamontes' testimony that he saw defendant place a gun in the yard of 5526 West Quincy. He questioned the officer extensively about his location when he allegedly observed this and his ability to view the place where defendant had allegedly put the gun down.  He questioned why the officer, if he had seen this, had not followed him into the yard of 5526 to detain him immediately but instead had allowed him to exit that yard. He questioned why the officer had not brandished his firearm if he had truly seen defendant in possession of a weapon. He raised the fact that Officer Bracamontes had not used the word "gun" when telling the other officers what to search for in the yard, and he attempted to elicit proof that the other officers had searched large areas of the yard instead of being directed to a specific location. He attempted to show that Officer Bracamontes had to ask Officer Ruiz whether the specific location where the gun had been found was by the gutter or by the meter, and he argued that Officer Bracamontes would not have had to ask this if he had seen where defendant had placed the gun. He elicited from Officer Ruiz that the area in question was a high-crime area, but an objection was sustained to defendant's follow-up question of whether the officer would agree it was possible that drugs, money, or guns could have been anywhere on that block. Also, defendant testified that no officer was in sight when he exited the yard of 5526.

¶ 41     Although defendant cited few legal principles in his *pro se* written motion or at the hearing, it is evident that he was relying on the principle that an arrest without probable cause or a warrant based thereon violates the right under the fourth amendment to the United States Constitution to be free from unreasonable searches and seizures. *People v. Lee*, 214 Ill. 2d 476, 484 (2005). "Probable cause to arrest exists when the facts known to the officer at the time of the arrest are sufficient to lead a reasonably cautious person to believe that the arrestee has committed a crime."

*People v. Grant*, 2013 IL 112734, ¶ 11. A police officer's knowledge for purposes of probable cause may be based on a tip from an informant, and, if the facts supplied in such a tip are essential to a finding of probable cause, the tip must be reliable. *In re D.W.*, 341 Ill. App. 3d 517, 523 (2003). The informant's veracity, reliability, and basis of knowledge are determinative. *Id.* One indicium of reliability of information exists when the facts learned through police investigation independently verify a substantial part of the informant's tip. *Id.* Also, a warrantless arrest cannot be justified by what is found during a subsequent search incident to the arrest. *Lee*, 214 Ill. 2d at 484.

¶ 42     It is evident to this court that defendant's first basis was an attempt to apply the above principles by arguing that his arrest was an unlawful seizure, because the officers lacked sufficient probable cause to have ever come to the 5500 block of West Quincy Street in the first place, based on the unreliability of the anonymous informant who called 911 and the nature of the information that caller provided. It is further clear that defendant's second theory was an attempt to apply the above principles by showing that Officer Bracamontes had arrested him without actually seeing him put a gun down, and his arrest had been justified only by the fortuitous fact that one of the other officers had found a gun hidden in the yard he had exited.

¶ 43     On appeal, however, defendant is advancing an issue that is factually and legally distinct from what is described above. Whereas the motion in the trial court focused on the police's action in arriving on the scene without sufficient information that criminal conduct was afoot and in arresting defendant without seeing him place a gun on the ground, defendant's appeal is solely based on the police's action in arriving on the scene and shouting threats to use their Tasers on defendant and others in the group. Defendant's contention on appeal is that this police action amounted to an unconstitutional "seizure" of him for fourth amendment purposes. His contention

on appeal is that he responded to this unlawful seizure by placing his gun on the ground, even though in the trial court he testified that he never had a gun in his possession that night. The legal effect of his proving this would be that the gun would not be considered "abandoned" property in which he had no expectation of privacy (see *People v. Thomas*, 2019 IL App (1st) 170474, ¶¶ 42-44), but rather the police's discovery of the gun could be considered the fruits of an unlawful seizure. See *People v. Wilson*, 141 Ill. App. 3d 156, 159 (1986).

¶ 44        If defendant had intended to show in the trial court that the officers' threats to use force amounted to an unlawful seizure to which he responded by involuntarily abandoning his gun, he would have had to put on evidence and made argument as to " 'what point in time the defendant here was 'seized' within the meaning of the fourth amendment.' " *People v. Thomas*, 198 Ill. 2d 103, 110 (2001) (quoting *People v. Long*, 99 Ill. 2d 219, 229 (1983)).[1] "For if there was no seizure, then the fourth amendment was not implicated at that point." *Id.* at 111. A person is seized within the meaning of the fourth amendment " 'only when, by means of physical force or a show of authority, his freedom of movement is restrained.' " *People v. Almond*, 2015 IL 113817, ¶ 57 (quoting *United States v. Mendenhall*, 446 U.S. 544, 553 (1980)). In other words, a person is seized when, considering the totality of the circumstances surrounding the incident, a reasonable person would believe that he or she is not free to leave. *Id.* (citing *People v. Oliver*, 236 Ill. 2d 448, 456 (2010) (citing *Mendenhall*, 446 U.S. at 554)). However, while situations may exist in which a show of authority by police is sufficient to constitute a seizure, it is clear that a police show of authority cannot amount to a seizure within the meaning of the fourth amendment if the subject

---

[1] We note that defendant had the burden of proof on his motion to suppress. 725 ILCS 5/114-12(b) (West 2016). This included the burden to make a *prima facie* showing that the evidence was obtained in an illegal search or seizure, at which point the burden would have shifted to the State to put on evidence to counter the defendant's *prima facie* case. *Cregan*, 2014 IL 113600, ¶ 23.

does not submit to it. *Thomas*, 198 Ill. 2d at 111-12; *California v. Hodari D.*, 499 U.S. 621, 626 (1991). Thus, even if a certain show of authority by police would have constituted an unlawful seizure if the subject had yielded to it, the fourth amendment is not implicated if the subject flees anyway. *Thomas*, 198 Ill. 2d at 112.

¶ 45    Nothing in defendant's written motion, his questioning of the police witnesses, his own testimony, or his argument at the hearing indicates that he was attempting to make a showing that would satisfy the principles above. He did not attempt to factually develop the evidence surrounding the police's show of authority by threatening to use Tasers on him and the other men. Although we recognize that defendant testified at the hearing that he heard the police tell the men not to move or they would use their Tasers on them and that he was fearful because of this, defendant did not testify that he felt at that point that he needed to submit to this show of authority or that he was not free to leave. Instead, he testified that after hearing this, observing other men running from the police and being chased by them, and "observ[ing] several individuals that was on the block being seized and searched by the officers," he attempted to flee the scene by walking into the yard of 5526 West Quincy in the hope of exiting through the gangway. He testified that when he realized the gangway gate was locked, he turned around and exited the yard. He was walking at this point, and when he exited the yard there was nobody to the east, south, or west of it. He testified it was not until he was walking at approximately 5522 West Quincy that Officer Bracamontes stopped him and ultimately placed restraints on him. This interaction with Officer Bracamontes was the first interaction that defendant described personally having with any police officer that day. Furthermore, defendant never testified that he put his gun down only out of fear that the officers were going to use their Tasers on him. Instead, he testified that he never had a handgun in his possession at all that night, and he never bent down in the yard of 5526 West Quincy

to put anything on the ground. None of this indicates any attempt to raise in the trial court the issue defendant now presses on appeal.

¶ 46        Similarly, we discern nothing in the trial court's comments that would indicate that it understood the defendant to be raising the issue that he was subjected to an unconstitutional seizure based on the police threats to use Tasers against defendant, and that he had laid down his gun only in response to such threats. The trial court stated that the evidence had shown that gun was recovered from the ground after it had been placed there, and thus no illegal search had occurred. See *People v. Novakowski*, 368 Ill. App. 3d 637, 641 (2006) ("Property is considered abandoned when an individual drops it to the ground or leaves it behind in a public place," at which point it "may be searched and seized absent probable cause"). The trial court further stated that defendant had not established any expectation of privacy in the area searched or the property seized. See *Thomas*, 2019 IL App (1st) 170474, ¶ 48 (to exclude evidence allegedly obtained in violation of fourth amendment, defendant must establish that he had a reasonable expectation of privacy in the place searched or the property seized). These comments reflect different fourth amendment concepts than the ones defendant is raising on appeal, and nothing about the trial court's comments indicate to us that it believed defendant was raising the issue that an unlawful seizure occurred at the moment when police arrived and threatened violence against him.[2]

¶ 47        We set forth all of this in detail to demonstrate that the argument for suppression that defendant advances on appeal is far different than the argument for suppression that he presented to the trial court. As such, this court must conclude that defendant has forfeited review of this

_____

[2] We have also reviewed defendant's written motion for a new trial and his oral argument in support if it before the trial court. Nowhere in his written motion or oral argument did defendant raise the contention that he was entitled to a new trial based on the legal issue now advanced on appeal.

issue. *People v. Hughes*, 2015 IL 117242, ¶ 46. In *Hughes*, the supreme court held that the appellate court had erred by addressing grounds for suppression of a confession raised on appeal that were different than the grounds for suppression defendant had relied upon in the trial court. *Id.* The same result is required here. "By declining or failing to raise these claims below, defendant deprived the State of the opportunity to challenge them with evidence of its own, he deprived the trial court of the opportunity to decide the issue on those bases, and he deprived the appellate court of an adequate record to make these determinations." *Id.* "To consider such claims preserved would also multiply litigation by motivating parties to address at trial all conceivable arguments that might later be made and by forcing the trial court to consider not only the arguments made by [parties], but all arguments [the parties] might have made." *Id.*

¶ 48                                    B. Denial of right to counsel

¶ 49        Defendant argues that the trial court denied him the right to counsel by failing to properly admonish him to ensure that his waiver of counsel was knowing and voluntary, as required by Illinois Supreme Court Rule 401(a) (eff. July 1, 1984). He argues that an admonishment under Rule 401(a) was required when, on June 2, 2017, he "waived counsel a second time." He argues that the trial court incorrectly treated his comments that day as an indication that he wanted " 'to stay *pro se*,' " when in fact his comments constituted a request for waiver of counsel that required admonishment by the trial court to ensure it was knowing and voluntary.

¶ 50        The State argues that defendant has forfeited review of this issue by failing to raise this issue before the trial court or in his motion for a new trial. Defendant argues it may be reviewed as plain error. A reviewing court may address a forfeited claim under the plain error doctrine when: (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the

error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Reese*, 2017 IL 120011, ¶ 60. In applying the plain error doctrine, it is appropriate to first determine whether a clear or obvious error occurred. *Id.* (considering whether trial court's admonishments under Rule 401(a) involved plain error).

¶ 51 The sixth amendment to the United States Constitution (U.S. const., amend. VI) guarantees an accused in a criminal proceeding the right to the assistance of counsel, as well as the correlative right to proceed without counsel. *People v. Wright*, 2017 IL 119561, ¶ 39 (citing *Faretta v. California*, 422 U.S. 806, 832-34 (1975)). A defendant may competently waive counsel if such an election is voluntary and constitutes " 'a knowing and intelligent relinquishment or abandonment of a known right or privilege.' " *People v. Baker*, 92 Ill. 2d 85, 91 (1982) (quoting *Edwards v. Arizona*, 451 U.S. 477, 482 (1981)). When a defendant seeks to waive counsel, the trial court must satisfy itself that his waiver of this constitutional right is both knowing and voluntary. *People v. Kidd*, 178 Ill. 2d 92, 104 (1997). The requirement of a knowing and intelligent choice requires a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Id.* at 104-05. Although a court may consider a defendant's decision to represent himself unwise, if his decision is freely, knowingly, and intelligently made, it must be accepted. *People v. Baez*, 241 Ill. 2d 44, 116 (2011).

¶ 52 Supreme Court Rule 401(a) requires a trial court to provide three admonishments to a defendant before it can find the defendant has waived the right to counsel. Rule 401(a) provides:

"Any waiver of counsel shall be in open court. The court shall not permit a waiver of counsel by a person accused of an offense punishable by imprisonment without first, by

addressing the defendant personally in open court, informing him of and determining that he understands the following:

(1) the nature of the charge;

(2) the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences; and

(3) that he has a right to counsel and, if he is indigent, to have counsel appointed for him by the court." Ill. S. Ct. R. 401(a) (eff. July 1, 1984).

The purpose of Rule 401(a) is to ensure that a defendant's waiver of counsel is knowingly and intelligently made. *People v. Haynes*, 174 Ill. 2d 204, 241 (1996). A trial court's compliance with Rule 401(a) is required for an effective waiver of counsel. *Wright*, 2017 IL 119561, ¶ 41. However, substantial compliance with Rule 401(a) is sufficient provided the record indicates that the waiver of counsel is knowingly and voluntarily made. *Id.*

¶ 53      At defendant's arraignment in this case on November 15, 2016, he informed the trial court that he intended to waive his right to counsel and represent himself *pro se*. Upon his doing so, the trial court engaged in a thorough admonishment, which included informing him of and confirming that he understood the nature of the charges, the possible sentences, that he had a right to counsel, and that counsel would be appointed for him if he was indigent. In addition to advising defendant of what was required by Rule 401(a), the trial court advised him of the further points suggested in *People v. Ward*, 208 Ill. App. 3d 1073, 1081-82 (1991). We have set forth the trial court's admonishment in detail above. *Supra* ¶¶ 4-7. There is no contention that the trial court failed to properly admonish defendant under Rule 401(a) on November 15, 2016.

¶ 54    From the time of his arraignment through the conclusion of the hearing on the motion to quash arrest and suppress evidence on June 1, 2017, defendant represented himself *pro se* in the trial court proceedings. At the conclusion of that hearing, defendant stated to the trial court that he "would like to step down *pro se*." The following exchange then occurred:

"THE COURT: You want a lawyer?

THE DEFENDANT: Yes, sir.

THE COURT: All right. The Public Defender will be appointed. They're not here now. *** I'm going to put your case over till tomorrow and then you can have your lawyer meet with you again.

All right. Public Defender appointed. It will be by agreement to tomorrow, which is June 2nd."

The trial court's wrote "PDA" on the disposition sheet from that day, indicating the Public Defender's Office had been appointed.

¶ 55    However, when the case was called the following morning, June 2, 2017, the following exchange occurred:

"THE COURT: Mr. Williams was representing himself. Yesterday he had some motions and he asked the public defender be reappointed.

MS. POLAK [(ASSISTANT PUBLIC DEFENDER)]: Judge, I just spoke to Mr. Williams and he told me that he does not want the services of the public defender.

THE COURT: What happened?

MS. POLAK: I don't know.

THE COURT: Yes, Mr. Williams?

THE DEFENDANT: The defendant would like to proceed *pro se*.

THE COURT: You want to continue *pro se*?

THE DEFENDANT: Yes, sir.

THE COURT: I thought you said—yesterday you said you wanted a lawyer.

THE DEFENDANT: No, I recant that. I think about it. I know my case better than anyone. And the fact that—I believe—

THE COURT: Okay. All right. You want to stay *pro se*. That's fine."

¶ 56    Defendant contends that the exchanges set forth above amounted to a second request by him to waive counsel, which required readmonishment by the trial court to ensure that such waiver was knowing and voluntary. He argues that on July 1, 2017, the public defender was appointed to represent him. Thus, he contends, his comments on July 2 were not a request to "stay *pro se*," as the trial court understood them, but rather it was a request by him to waive counsel. He argues that his request for counsel and the appointment of the Public Defender's Office to represent him "was an intervening event that disrupted his prior waiver of counsel."

¶ 57    Defendant's arguments implicate the "continuing waiver" rule. Under that rule, an intelligent and knowing waiver of counsel by a defendant once made before the trial court carries forward to all subsequent proceedings, including posttrial stages, unless the defendant later requests counsel or there are circumstances that suggest that the waiver was limited to a particular stage of the proceedings. *Baker*, 92 Ill. 2d at 91-92; *People v. Simpson*, 172 Ill. 2d 117, 138 (1996); *People v. Ware*, 407 Ill. App. 3d 315, 342 (2011). "Thus, even when a defendant executes a competent waiver of counsel at some earlier stage of the proceedings, this waiver may end if defendant alters his or her stand and requests counsel at a later stage." *People v. Cleveland*, 393 Ill. App. 3d 700, 705 (2009), *overruled in part on other grounds*, *People v. Jackson*, 2011 IL 110615. If a defendant

acting *pro se* makes such a request for counsel for a distinct stage of the proceedings, receives counsel, and subsequently requests to waive counsel again, the trial court may be required upon such a request to readmonish the defendant in substantial compliance with Rule 401(a). *Id.* at 712.

¶ 58        Here, we hold that what occurred in the trial court on June 2, 2017, did not amount to a second waiver of counsel requiring readmonishment to ensure that such waiver was knowing and voluntary. Instead, defendant simply reconfirmed that he wanted to remain *pro se* as he had been, and the knowing and voluntary waiver defendant made after being admonished at his arraignment continued to be effective on that date and afterward. Although defendant did make a request for counsel at the end of court on June 1, he immediately informed the trial court at the beginning of court on June 2 that he wanted to "recant" that request after thinking more about it and that he wanted "to proceed *pro se*." This was done in the presence of the Assistant Public Defender, who never attempted to speak or take any other action on defendant's behalf. Thus, regardless of whether the Public Defender's Office was technically appointed to represent him, it is clear that as a practical matter it never did. Thus, the trial court was correct to view the situation before it as one in which the defendant was expressing an intent to "stay *pro se*" as he had been throughout the entirety of the case to that point, and not as a situation in which he had been represented by counsel that he now wished to waive.

¶ 59        Although we acknowledge that defendant did make a request for counsel on July 1, we emphasize that the significance of a request for counsel in this context is the fact that such a request could cause an earlier competent waiver of counsel to become ineffective, thereby requiring the trial court, if the defendant later tries to waive counsel a second time, to inquire that the second decision to waive counsel is knowing and voluntary. In *Baker*, the supreme court explained this by quoting from *Davis v. United States*, 226 F.2d 834 (8th Cir. 1955), stating that where a

defendant had competently, intelligently, and understandingly waived his right to counsel at arraignment, there would be " 'a need for further inquiry [at sentencing] only if something transpired in the interim which justified such further inquiry, such as a request by Davis for counsel and advice when he appeared for sentencing. Davis made no request and made no statement, and accordingly Judge Joyce was entirely justified in taking his prior refusal of counsel as "definite." ' " *Baker*, 92 Ill. 2d at 93 (quoting *Davis*, 226 F.2d at 840). In this case, there is no question that defendant made a competent waiver of counsel at his arraignment on November 15, 2016. Based on our review of what occurred in the trial court on July 1 and 2, 2017—a request for counsel that defendant almost immediately recanted, with an statement that he wanted to procced *pro se* and his reason for wanting to do so—we see no reason to believe that defendant's previous valid waiver of counsel did not continue to be just as voluntary, knowing, and intelligent as it had been the day before. We believe the trial court realized this also, and appropriately recognized that a new inquiry with readmonishment was not necessary.

¶ 60    Defendant also makes the related argument that the trial court denied him his right to due process and his sixth amendment right to counsel by permitting him to represent himself while he was still represented by the Public Defender's Office. Defendant argues that after the trial court appointed the Public Defender's Office to represent him on July 1, 2017, it "did not then take any action to remove counsel from the case; that is, [defendant] was still represented by counsel, but [defendant] presented his own case without aid of counsel." His only citation is to *Powell v. Alabama*, 287 U.S. 45, 69 (1932), cited for the proposition that if a court "were arbitrarily to refuse to hear a party by counsel, employed by and appearing for him, it reasonably may not be doubted that such a refusal would be a denial of a hearing, and, therefore, of due process in the constitutional sense."

¶ 61 Defendant's argument is meritless. It is evident to us, as shown by the discussion above, that defendant knowingly, voluntarily, and intelligently invoked his constitutional right to represent himself in the proceedings below. The trial court was fully willing to appoint an attorney to represent him at trial if he wanted one, but defendant immediately recanted his request in the presence of the public defender and reconfirmed that he wanted to continue *pro se*. It is clear from the record that no party involved in the proceedings below—not the trial judge, the Assistant State's Attorneys, the Assistant Public Defender, or defendant himself—understood defendant to be represented by the Public Defender's Office. Other than the brief appearance to inform the court that defendant did not want that office's services, no one from that office ever appeared for defendant or attempted to act on his behalf. Therefore, there was never any "arbitrary refusal" by the trial judge to recognize an attorney employed by and appearing for him. We therefore reject defendant's arguments that his constitutional rights were violated.

¶ 62 Defendant has not established any clear or obvious error with respect to the violation of his sixth amendment or due process rights entitling him to relief under the plain error doctrine. Accordingly, defendant is not entitled to reversal of his convictions on this ground.

¶ 63                                   C. Illinois State Police document

¶ 64 Defendant's final argument on appeal is that the trial court erred in overruling his objection and admitting into evidence a notarized document from the Illinois State Police stating that defendant had not been issued a FOID card or concealed carry license as of December 20, 2016. The fact that defendant had not been issued a currently valid concealed carry license or FOID card was an element that the State had to prove to establish the AUUW charge against defendant. See 720 ILCS 5/24-1.6(a)(3)(A-5), (a)(3)(C) (West 2016). Defendant argues on appeal that, as this document was admitted without his having the opportunity to cross-examine any witness about its

contents, it was testimonial hearsay that violated his sixth amendment right to be confronted with the witnesses against him. U.S. Const., amend. VI.

¶ 65    The State argues that defendant failed to preserve this issue for appeal. It argues that, although defendant objected at trial, his objection was not on the basis that the introduction of the document violated his sixth amendment right to confrontation. Rather, he objected to the document on the basis that "that information was not provided before the officers responded to the 5500 block of West Quincy." The trial court overruled this objection. Also, the State contends that the defendant's motion for a new trial argued only that the trial court had erred in admitting the document on the grounds that " '[t]he officer received the notice "after" the officer "seized," "searched" and "arrested" the Defendant.' " The State contends that the failure to argue that the document was inadmissible on the grounds that it violated the sixth amendment results in forfeiture of the issue.

¶ 66    "Ordinarily, a defendant must both specifically object at trial and raise the specific issue again in a posttrial motion to preserve any alleged error for review." *People v. Woods*, 214 Ill. 2d 455 (2005). Further, "[i]t is well settled that a specific objection to the admission of evidence waives all grounds not specified." *People v. Casillas*, 195 Ill. 2d 461, 491 (2000). In *Casillas*, the supreme court held that by objecting to certain testimony only on the grounds that it was hearsay, a defendant waived review of the issue that the testimony was unreliable. *Id.* at 490-91. In *People v. Eyler*, 133 Ill. 2d 173, 219 (1989), the supreme court held that an objection to testimony only on relevancy grounds waived review that the testimony constituted improper opinion testimony and was prejudicial. Similarly, here, defendant's objection to the Illinois State Police document only the grounds that it was it not information known to the officers at the time they arrested defendant

forfeited review of the issue that the document was testimonial hearsay that violated his sixth amendment right to confrontation.

¶ 67    However, even if we did not find forfeiture, we would find that any error in the admission of the document from the Illinois State Police was harmless in light of the other evidence in the case that defendant had not been issued a FOID card or concealed carry license. "Confrontation clause violations are subject to harmless error review." *In re Brandon P.*, 2014 IL 116653, ¶ 50 (citing *In re Rolandis G.*, 232 Ill. 2d 13, 43 (2008)). The test is whether it appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained at trial. *Id.* When determining whether an error is harmless, the reviewing court may (1) focus on the error to determine whether it might have contributed to the conviction, (2) examine the other properly admitted evidence to determine whether it overwhelmingly supports the conviction, or (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence. *Id.*

¶ 68    Here, even if the Illinois State Police document had not been admitted, the State presented sufficient evidence in its case-in-chief that defendant did not possess a valid FOID card or concealed carry license on the date at issue. Officer Bracamontes testified that after he observed defendant put the gun on the ground in the yard, he stopped defendant and asked him if he had a concealed carry license or FOID card. He testified that defendant said no. Such testimony by a police officer that a defendant was asked about and denied having a valid FOID card or concealed carry license has been held sufficient to establish this element of the offense of AUUW. *People v. Grant*, 2014 IL App (1st) 100174-B, ¶¶ 25-26; see also *In re O.S.*, 2018 IL App (1st) 171765, ¶ 37 ("a police officer's testimony is sufficient to establish that an offender has not been issued a FOID card"). We note defendant did not cross-examine Officer Bracamontes concerning this testimony or otherwise try to undermine this evidence. Furthermore, defendant admitted on cross-

examination that he had not been issued a FOID card or concealed carry license as of the date at issue.

¶ 69    In light of this evidence, even if the Illinois State Police document was improperly admitted, it duplicated or was cumulative of other properly admitted evidence that defendant had not been issued a FOID card or concealed carry license. Therefore, we hold that beyond a reasonable doubt any error in the admission of the Illinois State Police document did not contribute to the verdict against defendant.

¶ 70                                    III. CONCLUSION

¶ 71    For the foregoing reasons, defendant's conviction is affirmed.

¶ 72    Affirmed.